*RECOMMENDED FOR FULL-TEXT PUBLICATION*
Pursuant to Sixth Circuit Rule 206

File Name: 05a0236p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

---

INTERNATIONAL UNION, UNITED AUTOMOBILE,
AEROSPACE AND AGRICULTURAL IMPLEMENT
WORKERS OF AMERICA; UNITED AUTOMOBILE,
AEROSPACE AND AGRICULTURAL IMPLEMENT
WORKERS OF AMERICA LOCAL 600; MARISOL
IRAIRA; LETICIA MENDOZA; MARIA CASTELLO;
JORGE FERNANDEZ; MARY ALLENBOROUGH,
                    *Plaintiffs-Appellants,*

No. 04-1056

           *v.*

PAMELA AGUIRRE; ROBIN KRYCH; JILL AGUIRRE;
RANCE AGUIRRE,

                    *Defendants-Appellees.*

---

Appeal from the United States District Court
for the Eastern District of Michigan at Detroit.
No. 01-72394—Victoria A. Roberts, District Judge.

Argued: January 26, 2005

Decided and Filed: June 1, 2005

Before: BOGGS, Chief Judge; MARTIN, Circuit Judge; GWIN, District Judge.[*]

---

**COUNSEL**

**ARGUED:** Renate Klass, MARTENS, ICE, KLASS, LEGGHIO & ISRAEL, Royal Oak, Michigan, for Appellants. Timothy K. Carroll, DYKEMA GOSSETT, Detroit, Michigan, David E. Sims, FINKEL, WHITEFIELD, SELIK, RAYMOND, FERRARA & FELDMAN, Farmington Hills, Michigan, for Appellees. **ON BRIEF:** Renate Klass, MARTENS, ICE, KLASS, LEGGHIO & ISRAEL, Royal Oak, Michigan, Michael F. Saggau, ASSOCIATE GENERAL COUNSEL, Detroit, Michigan, for Appellants. David E. Sims, FINKEL, WHITEFIELD, SELIK, RAYMOND, FERRARA & FELDMAN, Farmington Hills, Michigan, John W. Smith, DYKEMA GOSSETT, Detroit, Michigan, for Appellees.

---

[*]The Honorable James S. Gwin, United States District Judge for the Northern District of Ohio, sitting by designation.

1

---

**OPINION**

---

BOYCE F. MARTIN, JR., Circuit Judge.  The plaintiffs in this case are the International Union, United Automobile, Aerospace and Agricultural Implement Workers of America, its Local Union Number 600, and five former employees of an automobile parts supply company called Mexican Industries in Michigan, Inc.  Plaintiffs filed suit against defendants Pamela Aguirre,[1] Robin Krych, Jill Aguirre and Rance Aguirre, who at all relevant times were the principal shareholders of the company, alleging violations of the Employee Retirement Income Security Act, 29 U.S.C. § 1101 *et seq.*, the Labor Management Relations Act, 29 U.S.C. § 141 *et seq.*, and the Worker Adjustment and Retraining Notification Act, 29 U.S.C. § 2101 *et seq.*  In this appeal, plaintiffs challenge several rulings by the district court—namely, the award of summary judgment in favor of defendants on all claims, the grant of Rance Aguirre's motion for sanctions and the striking of an affidavit of plaintiffs' purported expert witness.  For the following reasons, we AFFIRM the district court's rulings.

**I.**

In 1979, Henry J. Aguirre, commonly referred to as "Hank Aguirre," founded Mexican Industries in Michigan, Inc., which was organized as a subchapter "S" corporation under the Internal Revenue Code.  As an S corporation, the company did not pay corporate income tax; instead, its net income passed through to the shareholders, who were taxed based upon their pro rata ownership of the company's stock.  *See* 26 U.S.C. § 1366(a).  The extent of the company's profits, if any, were determined by its auditors.  Hank Aguirre and the company's board of directors established an eighteen-month hold-back provision for corporate profits, whereby the company's profits during the calendar year were distributed in twelve equal monthly increments to shareholders beginning in July of the following calendar year.  This provision was used to ensure that the company maintained sufficient operating capital.

When Hank Aguirre died in September 1994, his estate owed taxes of approximately 6.8 million dollars.  Most of his stock in the company—4,590 shares—was transferred to the Henry J. Aguirre Living Trust, of which his four children, who are the defendants in this case, were the beneficiaries.  Pursuant to the Internal Revenue Code, the Trust was required to distribute the stock to the beneficiaries or to another trust within two years of Hank Aguirre's death in order to maintain the company's status as an S corporation.  *See* 26 U.S.C. § 1361(c)(2)(A)(ii).  The trustees—John Noonan and Edward Phillips—decided to establish four Qualified Subchapter S Trusts, one for each defendant, which were used to distribute stock while maintaining the company's subchapter S status.  Noonan and Phillips served as the trustees of these qualified trusts, and the defendants played no role in their administration.

In March 1995, the board appointed defendant Rance Aguirre to be the company's chief executive officer.  He resigned a few months later, but remained involved with the company as a director on a limited basis until 1998.  Pamela Aguirre became chief executive officer after Rance's resignation.  When it became clear that she was borrowing large sums of money from the company for her own personal use, however, the board added defendants Robin Krych and Jill Aguirre as co-chief executive officers.  Defendants contend that Pamela was not replaced outright because of her high profile in the community.

---

[1]Pamela Aguirre apparently defaulted in the district court and is not a party to this appeal.

Between 1995 and 1999, defendants received salaries, health insurance, director fees and distributions from the company, which plaintiffs maintain were excessive and unwarranted. Pursuant to the eighteen-month hold-back provision, the distribution of corporate profits that defendants received during this period included profits from the last six months of 1993 and all of the profits from 1994. The company continued to enjoy financial success throughout the first few years following Hank Aguirre's death. In approximately 1997, however, the company began experiencing financial problems. Between 1997 and 1999, its spending and debt increased and, after 1998, it made no annual profits at all. The company's financial condition continued to decline in 2000, as customers were lost and the company's principal lender refused to extend further credit. A management shake-up apparently further contributed to the company's demise.

In September 2000, in the midst of these events, the company entered into a collective bargaining agreement with the International and Local Unions. The agreement provided for employee vacation leave and other benefits, including medical, dental and vision coverage. In April 2001, due to its declining business and increasing debt, the company closed several plants and began laying off employees. The individual plaintiffs were laid off in June. On June 25, the company filed a voluntary bankruptcy petition pursuant to Chapter 11 of the Bankruptcy Code and ceased operations. On August 17, 2001, the International Union filed a claim in the bankruptcy proceeding for unpaid vacation, medical, dental and vision benefits, union dues and other amounts; it also alleged violations of the Worker Adjustment and Retraining Notification Act. The company's Chapter 11 proceeding was converted to a Chapter 7 liquidation proceeding in December.

The present action against the four Aguirre siblings was subsequently filed in the United States District Court for the Eastern District of Michigan. Plaintiffs allege that the company committed various violations of the Employee Retirement Income Security Act, the Labor Management Relations Act and the Worker Adjustment and Retraining Notification Act, and that defendants are personally liable for the damages caused by those violations. Plaintiffs have not sued the company directly because of the automatic stay provisions of the Bankruptcy Code. *See* 11 U.S.C. § 362(a)(1) (providing that the filing of a bankruptcy petition operates as a stay of the commencement or continuation of a judicial proceeding against the debtor).

On September 30, 2002, the district court denied defendants' motion for judgment on the pleadings. It permitted plaintiffs to amend their complaint to clarify their claims and to develop their theory during discovery. After the completion of discovery, defendants moved for summary judgment. On November 26, 2003, the district court granted the motion and dismissed the complaint. It also granted Rance Aguirre's motion for sanctions, as well as his motion to strike the affidavit of plaintiffs' purported expert witness. Plaintiffs then filed a motion for reconsideration, which was denied. This timely appeal followed.

## II.

### A. *Summary Judgment*

We review the district court's award of summary judgment de novo. *See Graham v. County of Washtenaw*, 358 F.3d 377, 382 (6th Cir. 2004). Summary judgment is appropriate where "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c). In determining the existence of a genuine issue of material fact, we view the evidence in the light most favorable to the non-moving party. *Graham*, 358 F.3d at 382.

The primary issue in this case is whether the defendants can be held individually liable for the company's alleged statutory violations. As an initial matter, defendants rely on *Peacock v. Thomas*, 516 U.S. 349 (1996), for the proposition that federal subject matter jurisdiction is lacking over plaintiffs' claims. In *Peacock*, the Supreme Court held that a plaintiff who had obtained a judgment against a corporate employer could not enforce the judgment in a second suit asserting a veil-piercing theory against a shareholder, without an independent basis for federal subject matter jurisdiction. 516 U.S. at 357-60. Defendants argue that there is no subject matter jurisdiction here because plaintiffs are seeking to hold them merely vicariously, rather than directly, liable for the company's alleged statutory violations. *See, e.g., Ellis v. All Steel Constr., Inc.*, 389 F.3d 1031, 1034 (10th Cir. 2004) (holding that claims for *direct* ERISA liability against a corporation's alter ego "do not implicate *Peacock* concerns," whereas claims positing *vicarious* liability reflect "an attempt to use ancillary jurisdiction to impose an obligation to pay an existing debt on a person not already liable for that judgment, which is precisely what *Peacock* holds must have its own jurisdictional basis independent of the federal character of the underlying ERISA judgment") (discussing *Cent. States, S.E. and S.W. Areas Pension Fund v. Cent. Transp., Inc.*, 85 F.3d 1282, 1286 (7th Cir. 1996)). In an apparent attempt to rebut plaintiffs' jurisdictional argument, plaintiffs insist that they are seeking to hold defendants directly, not merely vicariously, liable for the statutory violations alleged in the complaint, under a theory that they have labeled the "veil piercing version of the alter ego doctrine."[2]

Contrary to plaintiffs' assertions, we agree with the district court and defendants that there is no such thing as a "veil piercing version of the alter ego doctrine." Veil piercing and alter ego concepts are separate and distinct. In general, as the Seventh Circuit has explained, "[e]fforts to pierce the corporate veil ask a court to hold *A* vicariously liable for *B*'s debt." *Bd. of Trustees, Sheet Metal Workers' Nat'l Pension Fund v. Elite Erectors, Inc.*, 212 F.3d 1031, 1038 (7th Cir. 2000). By contrast, "a contention that *A* is *B*'s 'alter ego' asserts that *A* and *B* are *the same entity*; liability then is not vicarious but direct." *Id.* (citations omitted) (emphasis in original). Plaintiffs' purported theory of recovery conflates and confuses these two very different concepts and is unsupported by any legal authority of which we are aware. In any event, neither concept permits recovery against defendants under the facts of this case.

In the labor law context, the alter ego doctrine of direct liability typically applies in "disguised continuance" cases "to bind a new employer that continues the operations of an old employer in those cases where the new employer is merely a disguised continuance of the old employer." *NLRB v. Fullerton Transfer & Storage Ltd., Inc.*, 910 F.2d 331, 336 (6th Cir. 1990) (citations and internal quotation marks omitted). The doctrine also applies in "so-called double-breasted operations to determine whether two or more coexisting employers performing the same work are in fact one business, separated only in form." *Id.* "In both instances, the [National Labor Relations] Board has formulated the test as whether the two enterprises have substantially identical management, business, purpose, operation, equipment, customers, supervision and ownership." *Id.* (citations and internal quotation marks omitted). Although the present case arises in the labor law context, the district court found, and plaintiffs concede on appeal, that it involves neither a disguised continuance situation nor a double-breasted operation; accordingly, the alter ego doctrine is inapplicable.

---

[2]Plaintiffs' second amended complaint alleges as follows:

> As alter egos of [the company], the individual Defendant shareholders are personally liable for the obligations owed by [the company] as set forth in this Complaint. As alter egos of [the company], the individual Defendant shareholders are the 'employer' under Section 3(5) of ERISA, under Section 301 of the LMRA, and under Section 2(a) of the WARN Act.

With respect to veil piercing, even if it were enough for plaintiffs to prove that the corporate veil should be pierced (which, as explained, defendants vehemently dispute), such proof is lacking here. We have held that the corporate veil may be pierced if the court finds "substantial reasons for doing so" after considering three general factors: (1) "the amount of respect given to the separate identity of the corporation by its shareholders;" (2) "the degree of injustice visited on the litigants by recognition of the corporate entity," and (3) "the fraudulent intent of the incorporators." *Mich. Carpenters Council Health & Welfare Fund v. C.J. Rogers, Inc.*, 933 F.2d 376, 384 (6th Cir. 1991) (citing *Laborers' Pension Trust Fund v. Sidney Weinberger Homes*, 872 F.2d 702, 704 (6th Cir. 1988)) (internal quotation marks omitted). In analyzing these three general factors, courts frequently consider more specific factors such as "undercapitalization of the corporation, the maintenance of separate books, the separation of corporate and individual finances, the use of the corporation to support fraud or illegality, the honoring of corporate formalities, and whether the corporation is merely a sham." *Sidney Weinberger Homes*, 872 F.2d at 704-05.

In an attempt to establish entitlement to veil piercing, plaintiffs argue primarily that the company was undercapitalized and that its funds were improperly siphoned to pay defendants excessive salaries and distributions. The district court found, however, that plaintiffs had produced insufficient evidence to establish a genuine issue of material fact as to whether defendants caused the company to be undercapitalized or whether they should have made more prudent or conservative decisions regarding salaries and distributions. On the present record, we agree with the district court's assessment that the evidence does not warrant piercing of the corporate veil.

Plaintiffs have failed to show a genuine issue of material fact as to any of the three veil-piercing factors. First, there is no evidence of a lack of respect for the separate identity of the corporation. Until its demise, the company observed standard corporate formalities. For example, it had an accounting department headed by a chief financial officer, as well as non-shareholder officers and staff who managed day-to-day corporate operations. It conducted regular shareholder and director meetings and kept thorough minutes. There is no evidence that defendants commingled their personal funds with corporate funds. To the extent that defendants were paid for their service as officers and directors, the company issued the necessary tax forms to reflect their compensation.

Nor have plaintiffs demonstrated the kind of injustice that is required to disregard the corporate form. Although plaintiffs view defendants' salaries and director fees as excessive, there is no evidence indicating that they were not authorized in good faith by an informed board. Plaintiffs also argue that the distributions that defendants received from 1995 to 1999 were excessive in light of the company's net income during that period. But the fact that the distributions may have been large as compared to the company's net income during that particular period is explained by the eighteen-month hold-back provision established by Hank Aguirre and the board of directors. Moreover, when the company started suffering losses, defendants stopped receiving distributions. They still had to pay taxes on the corporate income, however, because of the company's status as an S corporation. 26 U.S.C. § 1366(a) (providing that shareholders of an S corporation are taxed on corporate income regardless of whether they receive distributions). In sum, although plaintiffs certainly have a right to be upset about the company's failure, their plight does not constitute the type of injustice that warrants veil piercing. *See Fullerton*, 910 F.2d at 341 ("The mere fact that the company ceased operation without being able to pay all of its debts is, of course, not the sort of injustice contemplated [in the veil-piercing analysis].") (citations omitted).

Finally, plaintiffs offer no evidence of fraudulent intent on the part of defendants-appellees. Although the evidence indicates some wrongdoing on the part of Pamela Aguirre, she is not a party to this appeal and there is no basis upon which to impute her actions or intent to her siblings. As a general matter, it appears to us that the state of affairs of which plaintiffs complain is largely a function of legitimate factors—such as business decisions that proved unsuccessful, the company's

status as an S corporation, the administration of the trusts and the execution of corporate policies established by Hank Aguirre and the board—rather than any fraud on the part of defendants-appellees.

For these reasons, we hold that the district court's award of summary judgment was proper.

## B. *Rule 11 Sanctions*

Plaintiffs also challenge the district court's grant of Rance Aguirre's motion for Rule 11 sanctions. The district court indicated that it granted the motion because plaintiffs' evidence fell "far short" of establishing Rance's liability. Notably, the district court limited the award to the amount of the costs, expenses and attorney fees incurred in presenting the motion for sanctions. Later, the court ruled that the sanctions award was to be paid by plaintiffs' counsel.

"The test for the imposition of Rule 11 sanctions in this circuit is whether the individual's conduct was reasonable under the circumstances." *Mihalik v. Pro Arts, Inc.*, 851 F.2d 790, 792 (6th Cir. 1988) (citation omitted). We review the district court's imposition of Rule 11 sanctions for abuse of discretion. *Id.* at 792-93. "Although the reasonableness test presents a mixed question of law and fact, a district court's decision regarding Rule 11 sanctions is reviewed under an abuse of discretion standard because of the district court's more intimate knowledge of the facts of these cases." *Id.* (citations omitted).

We find no abuse of discretion in the district court's very limited sanctions award. In our view, the district court properly exercised its discretion in determining that, at least by the close of discovery, it should have been clear to plaintiffs that the evidence failed to support any type of claim against Rance Aguirre, and that plaintiffs' counsel should bear all costs, expenses and fees incurred by Rance in the preparation of the sanctions motion.

## C. *Motion to Strike*

Finally, plaintiffs challenge the district court's grant of Rance Aguirre's motion to strike the affidavit of their purported expert witness, a certified public accountant. Generally, "[w]e review the decision to grant or deny a motion to strike for an abuse of discretion, and decisions that are reasonable, that is, not arbitrary, will not be overturned." *Seay v. Tenn. Valley Auth.*, 339 F.3d 454, 480 (6th Cir. 2003). In his affidavit, the witness testified primarily in support of plaintiffs' contention concerning the company's supposed undercapitalization. Even if the affidavit had been admitted, however, it would not alter our conclusion that defendants cannot be held liable under any alter ego or veil piercing theory. Accordingly, even assuming that the district court did abuse its discretion in striking the affidavit, such abuse would constitute harmless error.

## III.

For these reasons, the district court's rulings are AFFIRMED.