RECOMMENDED FOR PUBLICATION
Pursuant to Sixth Circuit I.O.P. 32.1(b)
File Name: 20a0021p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

---

CHURCH JOINT VENTURE, L.P.,

  *Plaintiff-Appellant*,

  *v.*

EARL BENARD BLASINGAME; MARGARET GOOCH BLASINGAME; KATHERINE BLASINGAME CHURCH; EARL BENARD BLASINGAME, JR.; BLASINGAME FAMILY BUSINESS INVESTMENT TRUST; BLASINGAME FAMILY RESIDENCE GENERATION SKIPPING TRUST; THE BLASINGAME TRUST; FLOZONE SERVICES INC.; FIBERZONE TECHNOLOGIES INC.; GF CORPORATION; BLASINGAME FARMS, INC.; AQUA DYNAMICS GROUP CORPORATION,

  *Defendants-Appellees*.

No. 18-6142

---

Appeal from the United States District Court
for the Western District of Tennessee at Memphis.
No. 2:12-cv-02999—Samuel H. Mays, Jr., District Judge.

Argued: June 28, 2019

Decided and Filed: January 21, 2020

Before: NORRIS, CLAY, and SUTTON, Circuit Judges.

---

## COUNSEL

**ARGUED:** Bruce W. Akerly, AKERLY LAW PLLC, Coppell, Texas, for Appellant. Michael P. Coury, GLANKLER BROWN, PLLC, Memphis, Tennessee, for Appellees. **ON BRIEF:** Bruce W. Akerly, AKERLY LAW PLLC, Coppell, Texas, for Appellant. Michael P. Coury, GLANKLER BROWN, PLLC, Memphis, Tennessee, for Appellees.

NORRIS, J., delivered the opinion of the court in which CLAY and SUTTON, JJ., joined. SUTTON, J. (pp. 14–15), delivered a separate concurring opinion.

———————————

**OPINION**

———————————

ALAN E. NORRIS, Circuit Judge.  Church Joint Venture, L.P. ("CJV") purchased two judgments from the trustee of the 2009 bankruptcy case of Earl Benard Blasingame ("EBB") and his wife, Margaret Gooch Blasingame ("MGB" and, together, "the Blasingames").  CJV has pursued recovery against the Blasingames ever since—at issue here is a 2012 suit in which CJV seeks to reach the assets of certain trusts and corporations related to the Blasingames to satisfy those judgments.

**I.**

*A.      The Bankruptcy*

The Blasingames filed for Chapter 7 bankruptcy over a decade ago.  CJV purchased the debt owed by the Blasingames to two commercial banks, each debt arising from personal guarantees made by the Blasingames to secure loans to businesses that ultimately failed.

As part of their bankruptcy, the Blasingames were required to file Statements of Financial Affairs; they claimed that they owned no real property, owned personal property worth a total of $5,700, and had a total monthly income of $888.  The bankruptcy trustee and CJV successfully argued against the discharge of the Blasingames' debts, with the bankruptcy court noting that, "The record in this case is replete with instances in which the Debtors concealed assets from their creditors both before and after the filing of their bankruptcy petition."  One of the ways the Blasingames concealed their assets and income was through the use of several closely held and interconnected corporations and trusts.  CJV asserts that the defendant business entities and trusts are the alter egos of the Blasingames, and so the entities' assets should be available to satisfy the Blasingames debts.

B.      *The Corporations and Trusts*

In the early 1980s, EBB was the majority stockholder in a highly successful company called Aqua Glass Corporation.  In 1983, he formed the Blasingame Trust ("BT") to hold 60,000 shares of the company for the benefit of his then-minor children Earl Benard Blasingame, Jr. ("Ben") and Katherine Blasingame Church ("Katherine").  Aqua Glass was later acquired by a publicly traded company and the trust assets were eventually converted into other investments.

In the early 1990s, EBB and MGB defaulted on loans owed to Third National Bank that were secured by their personal residence and an approximately 205-acre tract of land adjacent to the residence, along with other real and personal property.  In 1993, EBB's mother Mavoureen Blasingame ("Mrs. Blasingame") stepped in to help EBB and MGB avoid foreclosure. This assistance took the form of two trusts formed by Mrs. Blasingame:  the Blasingame Family Residence Generation Skipping Trust ("Residence Trust") and the Blasingame Family Development Generation Skipping Trust ("Development Trust").  EBB and MGB serve as trustees for those trusts, while EBB, MGB, Ben, and Katherine are the trust's beneficiaries.  Mrs. Blasingame loaned the Residence Trust $460,000 and the Development Trust $40,000, and with that money the trusts purchased EBB's and MGB's residence and the adjacent tract, respectively, paying off Third National and removing its liens.  The Residential Trust includes a life estate in the residence for the Blasingames, and this court recently affirmed that CJV could not reach that life estate.  *In re Blasingame*, 920 F.3d 384, 395 (6th Cir. 2019) ("[T]he Blasingames' limited equitable interest in [their] residence is not available to creditors.").

In 1994, Mrs. Blasingame formed two more trusts, one for the benefit of Ben and one for the benefit of Katherine.  She purchased from EBB and MGB a tract of approximately 1,500 acres of farmland and transferred it to the trust for Ben, and another tract of approximately 1,300 acres and transferred it to the trust for Katherine.  The trust for Katherine also purchased the 205 acres owned by the Development Trust.

In 1995, Mrs. Blasingame formed yet another trust, the Blasingame Family Business Investment Trust ("BIT"), again with EBB and MGB as trustees, and EBB, MGB, Ben, and Katherine as beneficiaries. The BIT invested directly in some real estate, and also formed GF Corporation for the purpose of additional real estate investing. In 2006, the trusts for Ben and Katherine were merged into the BIT, and so those trusts are not parties to this litigation. The Development Trust is also not a party.

Turning to the corporations, EBB formed Blasingame Farms, Inc. ("BFI") in 1994 to provide property maintenance services to the various real estate holdings. EBB remains its president. In 2005, EBB transferred the BFI shares to the trusts for Ben and Katherine; after the merger of those trusts into the BIT, BFI is wholly owned by the BIT.

Flozone Services, Inc. was formed in 2002 by Katherine, who was initially the sole shareholder. Katherine currently owns 97.1% of the common stock, with the remaining common stock owned by two unrelated parties. Flozone also has preferred stock that is 100% owned by Aqua Dynamics Systems, Inc. ("ADSI"). ADSI, in turn, was formed in 1998 and primarily owns intellectual property rights that are licensed to Flozone. ADSI is owned by BT, BIT, and twenty-one other investors. The ownership of ADSI is not broken down by percentages in the record, but the Blasingames do not own any shares.

Finally, Fiberzone Technologies, Inc. was formed in 2004 by Katherine, who remains its sole shareholder. It has had minimal business operations for several years.

At the time of the suit, the relevant trust and corporate entities were structured as follows:

Relevant Trusts



Relevant Corporate Entities



C.          *Proceedings Below*

In 2012, CJV filed a federal diversity suit against the Blasingames, their children, and the entities and trusts mentioned above, alleging among other things that the three trusts and five corporations have each been used as instrumentalities of debtors to the extent that they should be ignored, and the entities' assets should be treated as the Blasingames' assets (thereby reachable by creditors such as CJV).

The district court analyzed CJV's claims of reverse alter ego and reverse veil piercing, and several alleged fraudulent conveyances, all under Tennessee law.  Several claims were dismissed, but two fraudulent transfer claims were allowed to go to trial: one for a transfer of money to a trust account and one for the transfer of real property to a trust.  CJV prevailed on both issues.  CJV appeals three orders by the district court[1] that together (1) dismissed all claims that were based on reverse alter ego or reverse veil piercing, (2) denied CJV's motion to certify to the Tennessee Supreme Court the question of whether Tennessee would recognize such theories, (3) dismissed one specific fraudulent transfer claim related to Flozone Services, Inc., and (4) denied CJV's motion for leave to amend its complaint to add to its legal theories that the trusts were "self-settled."

**II.**

We review de novo the district court's dismissal of CJV's claims for failure to state a claim.  *Majestic Bldg. Maint., Inc. v. Huntington Bancshares Inc.*, 864 F.3d 455, 458 (6th Cir. 2017).  The standard is the same when reviewing the claims for which the district court granted summary judgment.  *Brumley v. United Parcel Serv., Inc.*, 909 F.3d 834, 839 (6th Cir. 2018).

The district court's denial of CJV's motion to certify a question to the Tennessee Supreme Court is reviewed for an abuse of discretion.  *See Kentucky Emps. Ret. Sys. v. Seven Ctys. Servs., Inc.*, 901 F.3d 718, 731-32 (6th Cir. 2018).  Likewise, we review for abuse of

---

[1]District Court Order dated January 13, 2016, R. 146 at PageID 4105 available at *Church Joint Venture v. Blasingame*, No. 12-2999, 2016 WL 3248044 (W.D. Tenn. Jan. 13, 2016); District Court Order dated November 17, 2016, R. 185 at PageID 5867 available at *Church Joint Venture v. Blasingame*, No. 12-2999, 2016 WL 6810873 (W.D. Tenn. Nov. 17, 2016); and District Court Order dated April 26, 2018, R. 244 at PageID 6748 (no Westlaw or Lexis cite available).

discretion the denial of CJV's motion to amend its complaint. *Kinzel v. Bank of Am.*, 850 F.3d 275, 281 (6th Cir. 2017).

### A.          *Reverse Alter Ego and Reverse Veil Piercing in Tennessee*

As an initial matter, claims of "alter ego" and "veil piercing" are not exactly the same. *See Int'l Union, United Auto., Aerospace & Agr. Implement Workers of Am. v. Aguirre*, 410 F.3d 297, 302 (6th Cir. 2005). A veil piercing claim seeks to hold a second party liable for another's debt, while an alter ego claim asserts that the two parties should be treated as the same party, so the liability is direct, not vicarious. *Id.* The analysis and effects are similar, and the parties and district court treat them as essentially interchangeable.

In a traditional alter ego or veil piercing claim, the corporate or other entity form is ignored, and the entity's owners are held accountable for the debts or other obligations of the entities. This traditional type of claim is well settled in Tennessee:

> The separate identity of a corporation may be disregarded upon a showing that it is a sham or a dummy or where necessary to accomplish justice. *Oak Ridge Auto Repair Service v. City Finance Co.*, 57 Tenn. App. 707, 425 S.W.2d 620.
>
> In an appropriate case and in furtherance of the ends of justice, a corporation and the individual or individuals owning all its stock and assets will be treated as identical. *E.O. Bailey & Co. v. Union Planters Title Guaranty Co.*, 33 Tenn. App. 439, 232 S.W.2d 309.
>
> The principle of piercing the fiction of the corporate veil is to be applied with great caution and not precipitately, since there is a presumption of corporate regularity. 18 Am. Jur. 2d Corporations, § 43, p. 842, notes 79, 80, 81.
>
> Each case involving disregard of the corporate entity must rest upon its special facts. Generally, no one factor is conclusive in determining whether or not to disregard a corporate entity; usually a combination of factors is present in a particular case and is relied upon to resolve the issue. 18 Am. Jur. 2d Corporations, § 48, p. 847, notes 41 and 42.

*Schlater v. Haynie*, 833 S.W.2d 919, 925 (Tenn. Ct. App. 1991). "The party seeking to pierce the corporate veil has the burden of presenting facts demonstrating that it is entitled to relief." *Rogers v. Louisville Land Co.*, 367 S.W.3d 196, 215 (Tenn. 2012).

Even normal piercing of the corporate veil is a tool courts employ only in limited circumstances. Piercing the corporate veil in reverse—that is, holding an entity liable for the debts or obligations of its owner—is much less common and much more controversial. *See Reagan v. Connelly*, No. E2000-00451-COA-R3CV, 2000 WL 1661524, at *6 (Tenn. Ct. App. Nov. 6, 2000) ("Although some courts apparently have embraced the reverse piercing doctrine, others have expressed concerns about adopting this theory, describing it as potentially problematic or controversial.") (cleaned up). "Judge Learned Hand suggested in what may be the earliest case to consider such a claim, outside reverse piercing is only appropriate in the rare case of a subsidiary dominating its parent." *Floyd v. IRS*, 151 F.3d 1295, 1299–1300 (10th Cir. 1998) (citing *Kingston Dry Dock Co. v. Lake Champlain Transp. Co.*, 31 F.2d 265, 267 (2d Cir. 1929). To date, the parent-subsidiary context is the only one in which Tennessee courts have allowed reverse piercing. *See, e.g.*, *Cont'l Bankers Life Ins. Co. of the S. v. Bank of Alamo*, 578 S.W.2d 625, 632 (Tenn. 1979); *see also Nippert v. Jackson*, 860 F. Supp. 2d 554, 573 (M.D. Tenn. 2012) ("The Tennessee Supreme Court has only recognized the concept of reverse piercing in the context of a parent/subsidiary relationship.").

To be sure, the Blasingames, along with their children and the web of corporations and trusts at their disposal, have engaged in extensive, complex asset protection measures. On the other hand, asset protection is a legitimate, legally sanctioned objective; though one that has limitations of its own. *See Asset-Protection Trust*, *Black's Law Dictionary* (11th ed. 2019) (defining an asset-protection trust as "[a] trust designed specifically to insulate assets from the settlor's creditors"); Bogert's Trusts and Trustees §§ 211-30 (2019). Even assuming Tennessee were to recognize reverse veil piercing, whether the Blasingames have gone too far is not immediately apparent. CJV paints a compelling picture and makes broad claims of abuse, but many of the allegations are either unsupported or of only moderate severity. Further, there is a lack of uniformity between the Blasingames and the relevant trusts and corporations, which is an important factor in jurisdictions that allow reverse piercing. *See, e.g.*, *Chao v. Occupational Safety & Health Review Comm'n*, 401 F.3d 355, 364 (5th Cir. 2005).

In the end, here we need not wrestle with the question of whether the Blasingames have gone too far, because the weight of authority in Tennessee makes apparent that neither reverse alter ego nor reverse veil piercing is available in this context. As the district court explained:

> There is no authority under Tennessee law for reverse piercing the corporate veil outside the parent-subsidiary context. "[T]he Tennessee Supreme Court has never recognized reverse piercing in a corporation/shareholder situation or, as here, in a trust/beneficiary context." *Nadler*, 2004 WL 1488544 at *5 (citing *Reagan v. Connelly*, 2000 WL 1661524 at *7 (Tenn. Ct. App. Nov. 6, 2000)); *see also Mfrs. Consolidation Serv., Inc. v. Rodell*, 42 S.W.3d 846, 866-67 (Tenn. Ct. App. 2000).
>
> Federal district courts sitting in Tennessee have squarely addressed this issue. "[I]n Tennessee law . . . [o]utside the parent-subsidiary context, there is no authority for piercing the corporate veil in reverse." *Starnes*, 765 F. Supp. 2d at 1050. "With no Tennessee courts recognizing the doctrine outside the context of a parent/subsidiary relationship, and because this case does not involve a parent-subsidiary relationship, the Court will not follow the 'reverse piercing' doctrine." *Hartford Fire Ins. Co. v. CMC Const. Co.*, 2010 WL 3338581 at *24 (E.D. Tenn. Aug. 24, 2010). "The Tennessee Supreme Court has only recognized the concept of reverse piercing in the context of a parent/subsidiary relationship . . . . [I]n the corporation/shareholder context, it has never adopted it." *Nippert*, 860 F. Supp. 2d at 554.

*Church Joint Venture v. Blasingame*, No. 12-2999, 2016 WL 3248044, at *8 (W.D. Tenn. Jan. 13, 2016) (alterations in original). Though the Tennessee Supreme Court has not squarely addressed the issue, when "an intermediate appellate state court rests its considered judgment upon the rule of law which it announces, that is a datum for ascertaining state law which is not to be disregarded by a federal court unless it is convinced by other persuasive data that the highest court of the state would decide otherwise." *West v. AT&T*, 311 U.S. 223, 237 (1940). There is no persuasive data that leads us to conclude that Tennessee's high court would embrace reverse piercing claims in the circumstances of this case.

B.          *Motion to Certify Question to the Tennessee Supreme Court*

CJV moved for the district court and this court to certify to the Tennessee Supreme Court the question of whether claims for reverse piercing or reverse alter ego are available under Tennessee law.  In Tennessee,

> The Supreme Court may, at its discretion, answer questions of law certified to it by the Supreme Court of the United States, a Court of Appeals of the United States, a District Court of the United States in Tennessee, or a United States Bankruptcy Court in Tennessee.  This rule may be invoked when the certifying court determines that, in a proceeding before it, there are questions of law of this state which will be determinative of the cause and as to which it appears to the certifying court there is no controlling precedent in the decisions of the Supreme Court of Tennessee.

Tenn. Sup. Ct. R. 23, § 1; *see also BKB Props., LLC v. SunTrust Bank*, 453 F. App'x 582, 588 (6th Cir. 2011).

It is clear from Tennessee's certification rule that CJV's questions are *eligible* for certification—the questions are determinative, and the Tennessee Supreme Court has never ruled on the issue.  Nevertheless, the district court declined to certify the question, reasoning:

> "'The decision whether or not to utilize a certification procedure lies within the sound discretion of the district court.'" *Pennington v. State Farm Mut. Auto. Ins. Co.*, 553 F.3d 447, 449-50 (6th Cir. 2009) (quoting *Transam. Ins. Co. v. Duro Bag Mfg. Co.*, 50 F.3d 370, 372 (6th Cir. 1995)). "Certification 'is most appropriate when the question is new and state law is unsettled.'" *Id.* at 450 (quoting *Transam*, 50 F.3d at 372). Federal courts "generally 'will not trouble our sister state courts every time an arguably unsettled question of state law comes across our desks. When we see a reasonably clear and principled course, we will seek to follow it ourselves.'" *Id.* (quoting *Pino v. United States*, 507 F.3d 1233, 1236 (10th Cir. 2007)).
>
> Certification is not necessary in this case.  There is a reasonably clear and principled course.  There is no authority under Tennessee law for reverse piercing the corporate veil outside the parent-subsidiary context.  "[T]he Tennessee Supreme Court has never recognized reverse piercing in a corporation/shareholder situation or, as here, in a trust/beneficiary context." *Nadler*, 2004 WL 1488544 at *5 (citing *Reagan v. Connelly*, 2000 WL 1661524 at *7 (Tenn. Ct. App. Nov. 6, 2000)); *see also Mfrs. Consolidation Serv., Inc. v. Rodell*, 42 S.W.3d 846, 866-67 (Tenn. Ct. App. 2000).

*Church Joint Venture*, 2016 WL 3248044, at \*8. Having carefully reviewed the record, the arguments of the parties, and the relevant authorities, the district court did not abuse its discretion in deciding that reverse piercing is not a novel or unsettled area of law and that certification is unnecessary. In fact, we agree with the district court and likewise decline CJV's invitation for this court to certify the question. As described in the previous section, the weight of Tennessee authority makes apparent that reverse alter ego and reverse veil piercing, outside of the parent-subsidiary context, is not permitted. "Certainly, the decision concerning whether to certify is not always straightforward. . . . But the mere fact that ceding our discretion would be easier, and perhaps even more expedient, is not an adequate reason for us to shirk from our judicial obligations." *Lindenberg v. Jackson Nat'l Life Ins. Co.*, 919 F.3d 992, 993 (6th Cir. 2019) (Clay, J., concurring in the denial of rehearing en banc).

### C. CJV's Fraudulent Transfer Claim Against Flozone Services, Inc.

CJV alleges that the Blasingames fraudulently conveyed assets to Flozone Services, Inc. Specifically, CJV alleges that the Blasingames "loaned" $225,000 to Flozone and failed to disclose that loan. The district court allowed that specific allegation to survive a motion to dismiss, but the court subsequently granted summary judgment because CJV had "adduced no evidence to support that allegation, despite voluminous and lengthy discovery, numerous depositions, and multiple opportunities for response." And CJV "has not specifically alleged any other transfers of assets" to Flozone.

In its briefing to this court, CJV offers nothing new to support its fraudulent conveyance claim. CJV's assertions about Flozone transfers mirror the general allegations made in support of its alter ego and reverse piercing claims. For instance, CJV asserts that there were various transfers of money *among* the non-debtor defendants, including "transfers of an enormous amount of money from" Flozone to the trusts, ultimately for the benefit of the Blasingames. But nothing offered supports a transfer from the Blasingames to Flozone that would satisfy the elements of a fraudulent conveyance claim.

D.       *District Court Denial of CJV's Motion for Leave to Amend Its Complaint*

Our review of a denial of leave to amend starts with the principle that a trial "court should freely give leave [to amend a pleading] when justice so requires."  Fed. R. Civ. P. 15(a)(2).  However, "'[a]lthough Rule 15(a) indicates that leave to amend shall be freely granted, a party must act with due diligence if it intends to take advantage of the Rule's liberality.'" *Pittman v. Experian Info. Sols., Inc.*, 901 F.3d 619, 641 (6th Cir. 2018) (quoting *United States v. Midwest Suspension & Brake*, 49 F.3d 1197, 1202 (6th Cir. 1995)).

This "court requires 'at least some significant showing of prejudice to deny a motion to amend based solely upon delay.'"  *Siegner v. Twp. of Salem*, 654 F. App'x 223, 228 (6th Cir. 2016) (quoting *Prater v. Ohio Educ. Ass'n*, 505 F.3d 437, 445 (6th Cir. 2007)).  "The longer the period of an unexplained delay, the less will be required of the nonmoving party in terms of a showing of prejudice." *Pittman*, 901 F.3d at 641 (quoting *Phelps v. McClellan*, 30 F.3d 658, 662 (6th Cir. 1994)).  And "[a]llowing an amendment after discovery is closed and summary judgment motions are fully briefed imposes significant prejudice on defendants." *Siegner*, 654 F. App'x at 228 (quotation omitted) (finding prejudice to the defendant when the amendment was filed one month after the motion cut-off date).  Allowing amendment after summary judgment motions have been decided is especially problematic.  *See Glazer v. Chase Home Fin. LLC*, 704 F.3d 453, 458–59 (6th Cir. 2013) ("[A]llowing amendment under these circumstances would encourage delay and bad faith on the part of plaintiffs and prejudice defendants . . . ."), *abrogated on other grounds by Obduskey v. McCarthy & Holthus LLP*, 139 S. Ct. 1029 (2019).

Here, CJV filed its original complaint to the district court on November 16, 2012, and filed an amended complaint on June 14, 2013.  In September 2017, after discovery and dispositive motions were complete and the remaining matters set for trial, CJV moved the district court for leave to file a second amended complaint.  CJV sought to add as a legal theory that the trusts were in fact self-settled, and so were reachable by CJV as a creditor.

CJV justified its five-year delay by claiming it did not realize that claims based on the trusts being self-settled were included in the claims CJV purchased from the bankruptcy estate in 2011.  Notably, in CJV's complaint to the bankruptcy court, and its original and first amended

complaint to the district court, CJV factually alleged that the trusts were self-settled, but did not include any legal theory of recovery based on those facts.

The district court rejected that justification, noting that in addition to CJV consistently alleging in its complaints that the trusts were self-settled, as a creditor, CJV could have directly asserted a claim against the allegedly self-settled trust under Tenn. Code Ann. § 35-15-505 without any need to purchase the claims out of the bankruptcy estate.

The failure of CJV to realize it could have made claims against the trusts under a self-settled theory is not an adequate reason for a nearly five-year delay, and the prejudice to defendants was apparent and substantial because (1) the delay was so long, (2) the deadlines for discovery had long passed, and (3) the matter was already scheduled for trial.  The district court did not abuse its discretion in denying CJV's motion for leave to amend.

**III.**

The judgment of the district court is **affirmed**.

---

## CONCURRENCE

---

SUTTON, Circuit Judge, concurring.  I join the court's opinion in full.  I write to add a word (or two) about my discomfort with incorporating "veil piercing" and "alter ego" theories into trust law.  Both concepts originate in corporate law, and both concepts should stay there.

A corporation and a trust are not one of a kind.  A corporation is a "distinct legal entity," with "legal rights, obligations, powers, and privileges" independent of the "natural individuals who created it." *Cedric Kushner Promotions, Ltd. v. King*, 533 U.S. 158, 163 (2001).  A trust isn't an entity at all; it is a "fiduciary relationship between multiple people." *Americold Realty Tr. v. Conagra Foods, Inc.*, 136 S. Ct. 1012, 1016 (2016).  A trust lacks many characteristics of corporate personhood.  It normally can't sue or be sued in its own name. *See id.*  Its trustees hold legal title to its assets. *See* Restatement (Third) of Trusts § 5 (2012); *see also Greenough v. Tax Assessors of Newport*, 331 U.S. 486, 494 (1947).  And its beneficiaries maintain an equitable interest in these assets, not merely a contractual one. *See* Bogert's Trusts and Trustees § 16 (2019); *N.C. Dep't of Revenue v. The Kimberley Rice Kaestner 1992 Family Tr.*, 139 S. Ct. 2213, 2218 (2019).

These distinctions make a difference when it comes to the legal protections afforded to corporations and trusts—and when it comes to the kinds of abuses that dilute those safeguards.  If a corporation uses the limited liability that comes with its entity status to accomplish "wrongful purposes," a court may disregard that status. *United States v. Bestfoods*, 524 U.S. 51, 62 (1998).  The court in other words may "pierce the corporate veil" or treat the corporation and its shareholders as "alter egos" of one another.

Some courts have applied these concepts to trusts.  They seem to reason that, because assets in trust also receive certain protections and because trustees may abuse those protections, the same logic applies to trusts—allowing the veil-piercing and alter-ego limitations on corporations to migrate to trusts. *See, e.g.*, *United States v. Badger*, 818 F.3d 563, 572 (10th Cir. 2016); *Vaughn v. Sexton*, 975 F.2d 498, 504 (8th Cir. 1992).

I am dubious. How could one "pierce the veil" of a trust? It doesn't *have* a veil, much less any form to pierce *into*. And what could it mean for a trust to be a beneficiary's "alter ego"? An "alter ego" is simply an entity's "second self." *Wellness Int'l Network, Ltd. v. Sharif*, 135 S. Ct. 1932, 1953 (2015) (Alito, J., dissenting) (quoting Webster's New International Dictionary 76 (2d ed. 1954)). As a non-entity, a trust can't be a "self" of any sort—secondary or otherwise. *See In re Huber*, 493 B.R. 798, 810 (Bankr. W.D. Wash. 2013); *Babitt v. Vebeliunas (In re Vebeliunas)*, 252 B.R. 878, 886 (Bankr. S.D.N.Y. 2000).

The culprit in the end may be careless language, nothing more. When advancing a veil-piercing claim against a trust, perhaps the plaintiff means only to challenge the creation of the trust. And perhaps, when bringing an alter ego claim, the plaintiff means only to allege that the *trustee* is the beneficiary's alter ego. *See Greenspan v. LADT, LLC*, 121 Cal. Rptr. 3d 118, 146 (Cal. Ct. App. 2010). Fair enough. But if that's the case, why rely on corporate law terminology in the first place?

Better, in my view, to call a problematic trust what it is: invalid because its "purpose is unlawful," Restatement (Third) of Trusts § 29 (2003), because it is "contrary to public policy," *id.*, or because it is a self-settled spendthrift trust, *id.* § 59. *See also* Bogert's Trusts and Trustees § 211–30 (2019). Trust law has a vocabulary of its own. Departing from it invites confusion, and risks leading courts to "disregard the form of a trust" even where it isn't "formed for an illegal purpose," and even where "there is the requisite separation between beneficiary and trustee." *In re Vebeliunas*, 332 F.3d 85, 90 (2d Cir. 2003).

Today, Tennessee law persuades us that the Volunteer State doesn't permit the claimant to obtain access to the assets of these trusts. *See Judd v. Guye*, No. M2017-01791-COA-R3-CV, 2018 WL 3460435, at *1 (Tenn. Ct. App. July 17, 2018), *appeal denied* (Jan. 16, 2019); *Nadler v. Mountain Valley Chapel Bus. Tr.*, No. E2003-00848-COA-R3CV, 2004 WL 1488544, at *4 (Tenn. Ct. App. June 30, 2004); *Reagan v. Connelly*, No. E2000-00451-COA-R3CV, 2000 WL 1661524, at *6 (Tenn. Ct. App. Nov. 6, 2000). Other States may follow this path or interpret their own trust protections as they wish—their house, their rules. Yet whatever Tennessee or other States choose to do in this area in the future, it seems to me, "veil piercing" and "alter ego" should have nothing to do with it.