RECOMMENDED FOR PUBLICATION
Pursuant to Sixth Circuit I.O.P. 32.1(b)
File Name: 22a0117p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT
───────────────

CHANA WILEY,

        *Plaintiff-Appellant*,

    *v.*

CITY OF COLUMBUS, OHIO; DARREN STEPHENS, RICHARD SHAFFNER, and KYLE ANDREWS, in their individual and official capacities,

        *Defendants-Appellees*.

No. 21-3615

Appeal from the United States District Court for the Southern District of Ohio at Columbus.
No. 2:17-cv-00888—James L. Graham, District Judge.

Decided and Filed:  June 2, 2022

Before:  SILER, KETHLEDGE, and READLER, Circuit Judges.
───────────────

**COUNSEL**

**ON BRIEF:**  John S. Marshall, MARSHALL AND FORMAN LLC, Columbus, Ohio, for Appellant.  Michael R. Halloran, CITY OF COLUMBUS DEPARTMENT OF LAW, Columbus, Ohio, for Appellees.
───────────────

**OPINION**
───────────────

SILER, Circuit Judge.  Chana Wiley ("Wiley"), as Administratrix for the estate of Jaron Thomas ("Thomas"), appeals the district court's order granting summary judgment in favor of the City of Columbus and some law enforcement officers, for allegedly using excessive force on Thomas resulting in his death.  We **AFFIRM**.

**I.**

*Factual Background.*   In 2017 in Columbus, Thomas called 911 requesting medical assistance.  He told the dispatcher that he had used cocaine, believed he might be overdosing from cocaine, was hallucinating, that his heart was beating intensely, and that he feared he would be shot.   Columbus law enforcement ("CDP") and Mifflin Township paramedics were dispatched to the address provided by Thomas.

The first officer on the scene, Defendant Officer Chase Pinkerman, arrived five minutes after Thomas's 911 call.  Following Pinkerman, paramedics Kyle Gibson and Joshua Burke arrived nearby and began preparing to administer medical aid once CDP ensured the safety of the scene.  When dispatched to a suspected overdose it is customary for law enforcement to secure the scene before paramedics enter and treat the potential patient.  Paramedics wait for law enforcement to give them an all clear because going into an overdose situation immediately can be dangerous, particularly when a 911 caller states he has been shot.

Pinkerman approached the door of the residence under the belief that someone inside may be overdosing and/or shot.  With his gun drawn Pinkerman knocked on the door and heard what sounded like a male yelling and someone falling down a flight of steps.  The door burst open, and Thomas came screaming past Pinkerman from within the house and ran into the front lawn before falling to the ground.  When Pinkerman ordered Thomas to stay on the ground and put his hands up, he did not comply.  Thomas then stood up, ran toward the street, continued disobeying orders to stop and show his hands, and then fell once more to the ground.  He started "violently rolling around and sporadically contorting his body."  Pinkerman was unsure if this was the man that had called 911, but he did think the individual was overdosing on drugs.

At this point Thomas once again got to his feet and continued running, so Pinkerman gave chase and when Thomas fell for a third time Pinkerman fell on top of him to restrain him. With Thomas on the ground Pinkerman attempted to subdue him but Thomas actively resisted. Pinkerman managed to secure Thomas's left wrist in handcuffs but could not secure his right wrist.  At this time CDP Officer Darren Stephens arrived to assist Pinkerman who was being

thrown back and forth by a resistant Thomas.  Stephens jumped into the scrum to assist Pinkerman, but Thomas continued to "aggressively resist[]."

While Pinkerman and Stephens tried to restrain Thomas, Defendant CDP Officer Michael Alexander arrived at the scene.  When Alexander arrived, Thomas was "kicking . . . squirming, [and] moving around," which prompted him to intervene and assist with the effort to restrain Thomas. Alexander grabbed Thomas's legs, crossed his ankles, and folded his legs at the knee toward Thomas's buttocks in a restraint technique called the "maximum resistor" maneuver.  The purported purpose of the maximum resistor technique is to control the legs of an individual when that individual is kicking and using his lower-body weight to resist law enforcement.  It is a trained technique.  Maximum resistor is not the same as hog-tying.  Thomas continued trying to pull away from the three CDP officers, so Pinkerman delivered a knee strike to Thomas's abdomen.  At this stage Thomas's right wrist was finally handcuffed such that both hands were cuffed behind his back.

Alexander let go of Thomas's legs, and the three officers stood him up.  Thomas continued to flail his upper body, but the officers tried to walk him to the police cruiser nearby and they signaled to paramedics to enter the scene.  Wiley does not claim the use of physical force by law enforcement up to this point in time constituted excessive force.  Wiley's claims are limited to the subsequent interaction between Thomas and CDP Officers.

After Thomas was upright and handcuffed, he continued being uncooperative and combative with Pinkerman, Stephens, and Alexander.  Alexander testified that Thomas was "kicking [and] dropping his body weight" and Pinkerman testified that he was "kicking to the front, kicking to the back . . . [and] trying to get away from our control."  Because of Thomas's ongoing resistance, and the danger he posed to those around him, the officers laid him back on the ground for a second time.  CDP Officers Kyle Andrews and Richard Shaffner arrived to assist Pinkerman, Stephens, and Andrews.

Once Thomas was returned to the ground in the prone position, Alexander went to his police cruiser to retrieve a hobble strap to secure Thomas's feet.  A hobble strap "is a black nylon strap that goes around the ankles and attaches to the handcuffs."  *State v. Davis*,

No. 99AP-1428, 2000 Ohio App. LEXIS 4429, at *5 (Ohio Ct. App. Sep. 28, 2000). The purpose of a hobble strap is to control an individual's feet and restrict his ability to kick. The concern remained that Thomas was overdosing and required immediate medical attention, but so long as Thomas continued kicking paramedics could not safely treat him. Alexander explained his reasoning for going to get the hobble strap: "We can't get him medical attention until he is cooperating. If he's not going to cooperate himself, then we have to make sure that he's not going to kick a medic, he's not going to kick us."

While waiting for Alexander to return with the hobble strap, Andrews crossed Thomas's legs, bent them at the knee, and placed Thomas's legs against his buttocks by, once again, employing the maximum resistor technique. To prevent Thomas from kicking, Andrews leaned some of his body weight onto Thomas's legs. Shaffner held Thomas's handcuffs and applied his left knee to Thomas's lower back/hip area above the buttocks to control Thomas's hips and keep him on the ground. Opposite of Shaffner, Stephens was on Thomas's right side with his knees against Thomas's shoulder to inhibit his movements. According to the officers, they sought to restrain Thomas while Alexander retrieved the hobble strap, which could then be applied as a replacement for the physical restraint imposed by the maximum resistor technique. As before, the goal of Andrews, Shaffner, and Stephens was to restrain Thomas to permit paramedics to safely enter the scene and treat Thomas for an overdose.

Thomas was kept in this position for approximately ninety seconds while Alexander looked for a hobble strap. During this time Thomas stopped resisting and Andrews and Shaffner noticed that his breathing slowed. Thomas was then rolled onto his side. Alexander returned with the hobble strap, but it was not needed as Thomas no longer resisted.

Paramedics Kyle Gibson and Joshua Burke arrived as Thomas was being rolled onto his side. Notably, in a statement given after January 14, 2017, Gibson stated that "one of the officers had his knee on the back to keep the patient from resisting." When asked about this later in his deposition, Gibson could not recall what he saw regarding an officer placing a knee on Thomas's back, nor did he comment on where the knee may have been placed precisely, if at all. Wiley draws attention in her brief to Gibson's reference to "a knee on [Thomas's] back" to

support the assertion that a knee was pressed on Thomas's back and caused asphyxia ultimately leading to his death.

Once paramedics Gibson and Burke were close to Thomas, they observed him seemingly conscious, breathing infrequently, and mumbling. Gibson surmised that Thomas was overdosing from opiates; he also noticed Thomas's "pinpoint pupils" as "a telltale sign [of] opiates." Realizing the seriousness of Thomas's condition, paramedics loaded him onto a cot and administered Narcan to increase his respiratory rate. At 12:02 a.m. paramedics deemed Thomas to be in a stable, non-life-threatening condition, but four minutes later he stopped breathing and went into cardiac arrest. Twelve minutes later paramedics were able to obtain a return of spontaneous circulation to Thomas's heart.

Thomas arrived at the hospital in critical condition; he had subtle respiratory motion but continued to convulse. The treating physician ordered a drug screen that tested positive for marijuana, cocaine, and opiates. Thomas never regained consciousness and died nine days later.

Thomas's cause of death was determined by the county coroner to be "anoxic encephalopathy" resulting from cardiac arrest, which was caused by "cocaine induced delirium." Wiley's medical expert, Dr. Francisco Diaz, disputed the coroner's reported cause of death. Dr. Diaz concluded that Thomas's death was cardiac arrest caused by "forcible restraint that precluded adequate breathing."

*Procedural Background.* Wiley sued in the United States District Court for the Southern District of Ohio in 2017, seeking civil damages. Wiley named the following defendants: the City of Columbus and Columbus Division of Police officers Michael Alexander, Richard Shaffner, Kyle Andrews, Darren Stephens, and Chase Pinkerman. Wiley sought relief for claims of: (1) excessive use of force in violation of the Fourth and Fourteenth Amendments, pursuant to 42 U.S.C § 1983; (2) wrongful death in violation of Ohio Rev. Code § 2125.02; (3) gross negligence; and (4) loss of consortium. The district court granted the defense motion for summary judgment.

**II.**

We review a district court's grant of summary judgment de novo. *Miller v. Maddox*, 866 F.3d 386, 389 (6th Cir. 2017); *Latits v. Phillips*, 878 F.3d 541, 547 (6th Cir. 2017). Issues of qualified immunity are also reviewed de novo. *Heyne v. Metro. Nashville Pub. Schs.*, 655 F.3d 556, 562 (6th Cir. 2011). "Summary judgment is appropriate 'if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law.'" *Maddox*, 866 F.3d at 389 (quoting Fed. R. Civ. P. 56(a)). The moving party is responsible for showing no genuine dispute of material fact, and the nonmoving party "must present 'significant probative evidence' that will reveal that there is more than 'some metaphysical doubt as to the material facts.'" *Id*. (citation omitted).

**III.**

This case presents the court review of a grant of summary judgment on four claims rooted in United States constitutional law and Ohio state law. The crux of these claims is whether the physical force used by CDP officers to restrain Thomas once he was placed on the ground for a second time rose to an abuse of Thomas's clearly established rights. It did not.

Wiley first challenges the district court's conclusion that no genuine dispute of material fact exists in the case and argues that reasonable inferences were not made in her favor. The dispute raised by Wiley is whether Officers Andrews and Shaffner applied substantial pressure to Thomas's upper back while he was in the prone position and on the ground for a second time. According to Wiley, a knee was placed on Thomas's upper back, and it contributed to positional asphyxia that caused his death. The officers argue that a knee was not placed on Thomas's upper back but was placed on his lower back/hip area to restrain him and make the scene safe for paramedics. The district court found "no record evidence that either Andrews or Shaffner applied any pressure to Thomas's mid or upper back, chest, or torso while he was lying on the ground." Wiley also suggests that the conflicting cause of death reports presents a genuine issue of material fact, but the district court expressly concluded that it need not address that issue to grant summary judgment to the defendants. We agree.

Wiley relies on the initial statements from Paramedic Kyle Gibson and a photograph of a bruise on Thomas's upper back to claim that it is a reasonable inference that an officer placed a knee on Thomas's upper back and caused his death from positional asphyxia. Gibson gave an initial statement to an unidentified detective that night. Gibson told the detective that when CDP officers gave paramedics the okay to approach and administer treatment to Thomas that as "[he] approached, one of the officers had his knee on the back to keep the patient from resisting." In a later deposition, Gibson stated that he did not have a present recollection of seeing an officer with a knee on Thomas's back. Even construing this testimony in the light most favorable to Wiley, it is unclear whether Gibson saw an officer placing a knee on Thomas's upper back, mid back, or lower back. Officer Shaffner gave sworn testimony that he placed his knee on Thomas's lower back/hip area to control him. It is reasonable to infer that Gibson observed Shaffner's knee on Thomas's lower back/hip area just as Shaffner stated under oath.

As for the bruise, Wiley suggests that a jury could reasonably infer it was caused by an officer placing a knee on Thomas's upper back. This is where the line between speculation and inference is drawn. Following Thomas's 911 call there were numerous opportunities for a bruise to be inflicted on his back.

Pinkerman said he heard what sounded like someone screaming and falling down a flight of stairs before the door burst open and Thomas ran out of the residence. Once outside Thomas fell on the ground many times, often violently, and when he fell in the street Pinkerman fell on top of him to subdue him. Thomas then struggled, kicked, swung his arms, and otherwise resisted the force of officers trying to restrain him. At one point, Thomas was punched and received a knee strike. Wiley does not claim these actions were excessive, but Wiley does ask the court to ignore them as potential sources of the bruise on Thomas's upper back. Wiley has not presented sufficient evidence that the bruise resulted from Shaffner's knee any more than Wiley has presented evidence that the bruise was not the result of Thomas's many physical impacts that night. This is inadequate for a jury to reasonably infer that Shaffner placed a knee on Thomas's upper back.

The analysis turns to the merits of Wiley's claims. Wiley sued Defendants, in both their individual and official capacities, for allegedly applying excessive force to Thomas in their

attempt to restrain him.  Wiley further alleges that the use of excessive force caused Thomas to lose consciousness, asphyxiate, and die nine days later.  Wiley also claims that the City of Columbus is liable for the officers' actions.  In turn Wiley named the City of Columbus as a Defendant.  Wiley's claims are aimed specifically at "[t]he Defendant Officers directly involved in the fatal segment[,] . . . Kyle Andrews, Richard Shaffner, and Darren Stephens."

At oral argument before the district court Wiley clarified that she is pursuing claims for the following: "1) Andrews's use of the maximum resistor position once Thomas was placed on the ground for the second time; 2) Shaffner's alleged use of his knee on Thomas's upper back while he was lying face first on the ground, compromising his ability to breathe; and 3) Stephens' alleged failure to intervene."

Wiley's excessive use of force claim is brought pursuant to 42 U.S.C. § 1983 and alleges violations of the Fourth and Fourteenth Amendments.  In response Andrews, Shaffner, and Stephens assert the affirmative defense of qualified immunity, which "protects government officials 'from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known.'" *Pearson v. Callahan*, 555 U.S. 233, 231 (2009) (quoting *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982)).  Qualified immunity is a question of law resolved by courts. *Everson v. Leis*, 556 F.3d 484, 494 (6th Cir. 2009).  The qualified immunity question turns on "(1) whether the officer violated the plaintiff's constitutional rights under the Fourth Amendment; and (2) whether that constitutional right was clearly established at the time of the incident." *Est. of Hill ex. Rel. Hill v. Miracle*, 853 F.3d 306, 312 (6th Cir. 2017) (citation omitted).  If either inquiry is answered in the negative, then qualified immunity protects the officer. *Goodwin v. City of Painesville*, 781 F.3d 314, 321 (6th Cir. 2015).  The plaintiff bears the burden of demonstrating a constitutional violation and a clearly established right at the time of the incident. *Hart v. Hillsdale County*., 973 F.3d 627, 635 (6th Cir. 2020).  When multiple defendants are named then § 1983 liability is analyzed individually based on an officer's own actions. *Binay v. Bettendorf*, 601 F.3d 640, 650 (6th Cir. 2010).

We turn to whether the law as of January 14, 2017, was clearly established that the techniques used by Andrews and Shaffner could not be applied under the circumstances they

used them. "'Clearly established' means that, at the time of the officer's conduct, the law was 'sufficiently clear' that every 'reasonable official would understand that what he is doing' is unlawful." *District of Columbia v. Wesby*, 138 S. Ct. 577, 589 (2018) (citation omitted). "Use of excessive force is an area of the law 'in which the result depends very much on the facts of each case,' and thus police officers are entitled to qualified immunity unless existing precedent 'squarely governs' the specific facts at issue." *Kisela v. Hughes*, 138 S. Ct. 1148, 1153 (2018) (per curiam) (citation omitted). "The rule's contours must be so well defined that it is 'clear to a reasonable officer that his conduct was unlawful in the situation he confronted.'" *Wesby*, 138 S. Ct. at 590 (quoting *Saucier v. Katz*, 533 U.S. 194, 202 (2001)). The plaintiff bears the burden of showing that a right is clearly established. *Barrett v. Steubenville City Schs.*, 388 F.3d 967, 970 (6th Cir. 2004). Here Wiley relies on three cases to show that the actions of Andrews and Shaffner violated a clearly established right. However, Wiley does not meet her burden. The cases Wiley relies on do not demonstrate that CDP officers violated a clearly established right because the cases are not analogous to the facts here.

Wiley argues that *Champion v. Outlook Nashville, Inc.* "clearly established that putting substantial or significant pressure on a suspect's back while that suspect is in a face-down prone position after being subdued and/or incapacitated constitutes excessive force." 380 F.3d 893, 903 (6th Cir. 2004). *Champion* is distinguishable because in that case Champion was face down, handcuffed, and bound at the ankles by a hobble strap. *Id*. at 897. Witnesses testified that officers sat on his back while he was prone on the ground. *Id*. at 897−98. Also, Champion was no longer resisting, and officers continued putting weight on his back. *Id*. at 903. In this case Thomas consistently resisted efforts to be restrained and he was not yet hobbled. Shaffner testified that he did not put pressure on Thomas's chest or breathing cavity, and no evidence rebuts this testimony. *Champion* fails to demonstrate that the actions of Andrews and Shaffner violated a clearly established right.

Next Wiley argues that *Martin v. City of Broadview Heights* clearly establishes a right against the force used on Thomas. 712 F.3d 951 (6th Cir. 2013). In *Martin* a mentally unstable individual that displayed no risk to others was subdued through severe force by law enforcement. This court found in *Martin* that the level of force used did not match the threat Martin presented.

*Id.* at 958−59.  Officers lay on Martin, fell on him, dropped a knee into his side, punched his face and torso repeatedly, wrapped his pelvis area with one officer's legs and then gripped his chin and neck, and kneeled on his calves.  *Id.*  In *Martin* there was little safety risk to others and the officers applied compressive body weight to his chest.  *Id.* at 959.  In this case Thomas presented a safety risk to officers, paramedics, and himself.  Officers here also did not apply compression to Thomas's chest, whereas at one point three officers were on top of Martin.  *Id.*  The facts in the instant case are distinguishable; *Martin* does not offer a clearly established right against the measures used to restrain Thomas nor is it applicable to the circumstances presented by Thomas's combative behavior.

Finally, Wiley relies upon *Griffith v. Coburn,* but it is not persuasive.  473 F.3d 650 (6th Cir. 2007).  In *Griffith* officers used an unprovoked neck restraint tactic.  *Id.* at 653, 657−58.  There is no allegation of a similar tactic being used on Thomas; therefore, *Griffith* does not demonstrate a clearly established right relevant to this case.

Wiley cannot meet her burden of demonstrating a clearly established right as of January 14, 2017, prohibiting the use of the techniques used by Andrews and Shaffner on Thomas under the circumstances of his erratic and combative behavior.  Because Wiley cannot show that Thomas had a clearly established right against the type of force that was used, the officers are entitled to qualified immunity

Wiley also names the City of Columbus as a Defendant in her § 1983 claims.  Specifically, Wiley makes two allegations: (1) that the actions of Officers Andrews and Shaffner were ratified after-the-fact by the Chief of Police for the City of Columbus; and (2) the City of Columbus has a custom of tolerating or acquiescing to federal rights violations.

A municipality is only liable under § 1983 "if the plaintiff demonstrates that the injury suffered was a direct result of the city's official policy or custom."  *Slusher v. Carson*, 540 F.3d 449, 456 (6th Cir. 2008).  To support Wiley's claims, she must demonstrate one of the following: "(1) the existence of an illegal official policy or legislative enactment; (2) that an official with final decision-making authority ratified illegal actions; (3) the existence of a policy of inadequate training or supervision; or (4) the existence of a custom of tolerance or

acquiescence of federal rights violations." *Burgess v. Fischer*, 735 F.3d 462, 478 (6th Cir. 2013).

Wiley argues that the Chief of Police ratified illegal actions by not disciplining Andrews and Shaffner. An internal investigation was conducted, and it was found that the officers did not violate CDP policy when they used force on Thomas. To prevail in this claim Wiley must show a custom of similar incidents such that ratification of those incidents establishes acquiescence. *See Burgess*, 735 F.3d at 479). Wiley does not offer record evidence to demonstrate this claim. Wiley only points to one prior instance where Andrews and Shaffner were disciplined for how they transported a detainee on a gurney. This is not adequate because the prior conduct must be like the instant case. *Burgess*, 735 F.3d at 478.

The City of Columbus is entitled to summary judgment because Wiley cannot demonstrate that Thomas suffered an injury due to the city's official policy or custom.

Wiley also brings Ohio state-law claims against Defendants for wrongful death, in violation of Ohio Rev. Code § 2125.02, gross negligence, and loss of consortium. These claims rest on the actions of the officers when Thomas was placed on the ground the second time and whether these claims hold merit depends upon the reasonableness of the use of force at that time. "When federal qualified immunity and Ohio state-law immunity under Ohio Rev. Code § 2744.03(A)(6) rest on the same questions of material fact, we may review the state-law immunity defense 'through the lens of federal qualified immunity analysis.'" *Wright v. City of Euclid*, 962 F.3d 852, 878 (6th Cir. 2020) (quoting *Hopper v. Plummer*, 887 F.3d 744, 759 (6th Cir. 2018)). Having found the actions of CDP officers shielded by federal qualified immunity, the same protection extends to Ohio state-law claims. Even if federal qualified immunity is not found, then Defendants are still shielded from liability under Ohio state-law immunity.

Employees of a political subdivision are presumptively immune from liability under Ohio Rev. Code § 2744.03(A)(6). *Cook v. City of Cincinnati*, 658 N.E.2d 814, 820–21 (Ohio Ct. App. 1995); *Howse v. Hodous*, 953 F.3d 402, 410 (6th Cir. 2020). Presumptive immunity is not applicable if any of the following apply: "(a) the employee's acts or omissions were manifestly outside the scope of the employee's employment or official responsibilities; (b) the employee's

acts or omissions were with malicious purpose, in bad faith, or in a wanton or reckless manner; or (c) civil liability is expressly imposed upon the employee by a section of the Revised Code. Ohio Rev. Code § 2744.03(A)(6)(a–c).

It is the plaintiff's burden to demonstrate how an employee's actions warrant a loss of immunity. *See Cook*, 658 N.E.2d at 820–21. Here Wiley only alleges gross negligence. Under Ohio law gross negligence is defined as wanton or reckless conduct. *Mohat v. Horvath*, No. 2013-L-009, 2013-Ohio-4290, 2013 Ohio App. LEXIS 4516, ¶ 23 (Ohio Ct. App. Sept. 30, 2013). "Wanton misconduct is the failure to exercise any care toward those to whom a duty of care is owed in circumstances in which there is great probability that harm will result." *Anderson v. City of Massillon*, 983 N.E.2d 266, 273 (Ohio 2012). "Reckless conduct is characterized by the conscious disregard of or indifference to a known or obvious risk of harm to another that is unreasonable under the circumstances and is substantially greater than negligent conduct." *Id*. Wiley presented no evidence that the officers acted with this state of mind. Defendant officers are immune to Wiley's state law claims under Ohio Rev. Code § 2744.03(A)(6).

## IV.

The district court did not err in granting Defendants' Motion for Summary Judgment. **AFFIRMED**.