NOT RECOMMENDED FOR PUBLICATION
File Name: 22a0519n.06

No. 22-1286

UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT

**FILED**
Dec 15, 2022
DEBORAH S. HUNT, Clerk

EDWARD HUGAN; DAMANY DEREK WILLIAMS,

    Plaintiffs-Appellants,

v.

CITY OF DETROIT, MICHIGAN, et al.,

    Defendants-Appellees.

)
)
)
)
)
)
)
)
)
)
)

ON APPEAL FROM THE UNITED STATES DISTRICT COURT FOR THE EASTERN DISTRICT OF MICHIGAN

OPINION

Before: BOGGS, KETHLEDGE, and WHITE, Circuit Judges.

**HELENE N. WHITE, Circuit Judge.** Appellants Edward Hugan and Damany Derek Williams appeal the district court's grant of qualified immunity to the defendant officers in this case brought under 42 U.S.C. § 1983. Because the search at issue was supported by probable cause and Appellants failed to present evidence of personal involvement in potentially unconstitutional conduct by Officers Wright, Morrison, and Gardner, we AFFIRM.

**I.**

On March 29, 2018, Detroit Police Officer Edward Wright submitted an affidavit in support of an application for a warrant to search the Green House—an unlicensed marijuana dispensary. In that affidavit, Wright swore that the Green House was listed as "not in compliance/closed by court order" and that he had "observed heavy traffic associated with this apparent illegal Marijuana 'dispensary' on numerous prior occasions." (R.23-2, PID 163.) Specifically, Wright stated that he had conducted surveillance of the Green House the day before and identified seven individuals

who entered and exited the premises in under an hour. Wright also stated that he discovered a citizen complaint about the Green House, which alleged "that the dispensary sells to anyone, even minors." (*Id.* at 164.) A judge issued the warrant, authorizing Detroit Police Department (DPD) officers to search "[t]he entire premises and curtilage commonly referred to as 2694 W. Davison AKA 'Green House'" for "[a]ny and all narcotics" and other related items. (*Id.* at 163.) DPD executed the warrant the same day and seized over $8,000 as well as hundreds of jars of marijuana, thousands of marijuana cigarettes and hundreds of marijuana edibles. Appellant Edward Hugan was present during the March 29, 2018 search, but was released by the police without citation after the officers realized that he was a security guard for the Green House. The Green House's owner, Mike Awdish, was arrested and charged with violations of the Controlled Substances Act.

On April 13, 2018, Wright submitted another affidavit in support of a second application for a warrant to search the Green House. In that affidavit, he stated that the Green House was "still 'not in' compliance with State and City guidelines for 'medical' Marijuana sales, and 'is not' allowed to be open for business." (R. 23-4, PID 177.) He further stated that he had conducted surveillance of the Green House for less than an hour on April 12, 2018 and had observed seven persons enter the Green House and emerge after several minutes. Wright also reported the results of the March 29, 2018 search, stating that "[a]ffiant and crew executed a narcotics search warrant" of the Green House "resulting in the recovery of 207,794 grams of marijuana and $8,105 in proceeds." (*Id.* at 176.) A warrant was issued April 13, 2018, authorizing a second search of the Green House for "any and all narcotics" as well as a variety of other drug-related items. (*Id.*)

DPD carried out the second search of the Green House on April 13, 2018. Officers seized $7,634 in cash, loose marijuana, storage bags of marijuana, marijuana edibles and a 2005 Pontiac G6 from the Green House and its curtilage. A group of six employees and customers were cited

for misdemeanor offenses. Hugan was again present at the search and again released without citation.

After the second raid, the Green House laid off its "budtenders" and shut the building down. Despite the building being shut down and the parking lot being blocked with traffic cones, people still tried to visit the establishment. A skeleton staff of security and janitorial staff, which included Hugan and Williams, were retained to maintain the building and address any inquiries. When visitors stopped by, the security guards informed them about voter registration and urged them to support marijuana legalization. Sometimes the security guards invited the visitors inside the building to continue their conversations.

On May 18, 2018, Wright submitted an affidavit in support of his request for a third warrant to search the Green House. Wright first recited the results of the March 29 and April 12 searches, noting that DPD had seized significant quantities of marijuana in the two prior searches. And he stated that he had conducted surveillance of the Green House on May 10, 2018 and May 17, 2018; on May 10, he observed nine individuals enter the Green House and emerge several minutes later, and on May 17, he saw another six individuals do the same. Wright also affirmed that he had verified with the Michigan Licensing and Regulatory Affairs that the Green House was still subject to a cease-and-desist order and he determined that the Green House was "still 'NOT' in compliance." (R.23-6, PID 191.) A judge granted the third search-warrant application on May 18, 2018, and authorized another search of the Green House for "any and all narcotics" as well as drug-related items. (*Id*. at 189.)

DPD executed the warrant the same day. Wright, along with Officers William Morrison, Jonathan Gardner, Ryan Paul, Henry Love, and Najah Allen, arrived at the Green House at 4:00 P.M. The officers were supervised by Sergeant Roy Harris. Hugan was standing in front of the

Green House's open front door. Harris recognized Hugan and instructed him to get on the ground. Hugan was then handcuffed by Harris, who told Hugan that the officers had received information that the Green House was still selling marijuana. Hugan denied this and explained that the business had been shut down.

The officers entered the Green House with guns drawn and encountered Williams behind the counter with another employee, Isaiah Rhone. Williams worked security for the Green House on Thursdays, Fridays, and Saturdays, and had stopped by the day of the search to pick up his pay. The officers handcuffed Williams and an officer asked him who "the black car" belonged to. (R.23-10, PID 277.) When Williams did not answer, the officer said that he would take a bat out and break the vehicle's windows. The officer asked again and Williams responded that the vehicle, a 2008 Ford Edge, was his, and gave the officer the combination to enter the vehicle. Ultimately, the officer seized the vehicle, as well as Williams's wallet, which contained $305, and Williams's firearm, for which he had a concealed-carry license. The vehicle was not returned to Williams for 16 months and Williams had to pay $600 to retrieve it from impound. The vehicle was dented on the doors when it was returned to Williams. Williams's firearm was returned to him approximately nine months after the search.

While Hugan and Williams were handcuffed inside the building, an officer searched Hugan's vehicle, a 2001 Chevrolet Tahoe, and then seized it, and everything in it, which included personal effects and a disputed amount of cash. Hugan testified that the police told him they had intel that he was hiding marijuana in his vehicle. Hugan did not receive his vehicle back until a year and a half later. When returned, the vehicle required approximately $1500 in repairs. In addition to both vehicles and Hugan's and Williams's personal effects, the officers also seized

money from the counter, which was intended to pay Williams and Hugan. Williams and Hugan were both cited for Loitering in a Place of Illegal Occupation, but the charges were later dismissed.

On March 23, 2020, Hugan and Williams filed this action against the City of Detroit and Detroit Police Officers Harris, Morrison, Paul, Love, Wright, Allen, and Gardner. They alleged that as a result of inaccurate information in the May 19, 2018 search-warrant application, the Green House was improperly searched a third time, and Hugan and Williams were unlawfully detained and their property wrongfully seized. Hugan and Williams alleged that the actions of the officers violated the First, Fourth, Eighth and Fourteenth Amendments, as well as the Michigan Constitution, and that defendants were jointly and severally liable under 42 U.S.C. § 1983. Hugan and Williams also alleged a § 1983 claim for municipal liability against the City of Detroit, and a number of state-law tort claims. Defendants filed an answer asserting the affirmative defense of qualified immunity, and later sought summary judgment on that defense.

While the summary judgment briefing was ongoing, the district court issued an order dismissing the claims against Officers Harris, Paul, Love and Allen. The district court explained that for more than a year, Hugan and Williams had failed to serve Harris, Paul, Love and Allen, and accordingly, dismissed the claims against those individual defendants without prejudice.

On March 11, 2022, the district court issued its order granting in part and denying in part the remaining defendants' motion for summary judgment. The district court determined that Hugan and Williams had abandoned their claims under the First, Eighth, and Fourteenth Amendments. Further, Hugan and Williams conceded in their summary judgment briefing that they had not uncovered any evidence of a policy by the City of Detroit to violate their constitutional rights and, therefore, agreed to the dismissal of their municipal-liability claim against the City of Detroit. Accordingly, all that remained to be addressed by the district court were the claims against

Officers Morrison, Wright and Gardner for Fourth Amendment violations and state-law torts. The district court granted summary judgment to the officers after determining that the third search was supported by probable cause and, therefore, did not violate Hugan and Williams's Fourth Amendment rights. The district court also determined that, although the seizure of Hugan and William's property could implicate a Fourth Amendment violation, there was no evidence in the record that Officers Morrison, Wright or Gardner played any active role in those seizures. Rather, the officers who had previously been dismissed from the litigation for failure to serve—Officers Paul and Harris—were responsible for the seizures of Hugan's and Williams's vehicles and cash, and for issuing the citations for loitering. And although "Defendant Officers Morrison, Wright, and Gardner may have been complicit in questionable conduct, such as attempting to disconnect the Green House's security cameras . . . they did not violate Plaintiff's clearly established constitutional rights."[1] (R.31, PID 360.) Accordingly, the district court granted the three officers summary judgment on the remaining § 1983 claim. The district court declined to exercise supplemental jurisdiction over the state-law claims. Hugan and Williams timely appealed.

## II.

We review a district court's grant of summary judgment de novo. *Lamb v. Kendrick*, 52 F.4th 286, 291 (6th Cir. 2022). "Summary judgment is proper where there is no genuine issue of material fact, and the moving party is entitled to judgment as a matter of law." *Id*. When reviewing a motion for summary judgment, "[t]he essential question is 'whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law.'" *Troche v. Crabtree*, 814 F.3d 795, 798 (6th Cir. 2016) (quoting

---

[1] The district court referred to deposition testimony in which both Hugan and Williams state that the officers disconnected the video system for the building. However, neither Hugan nor Williams identified which officers disconnected the video system.

*Hall v. Warren*, 443 F. App'x 99, 106 (6th Cir. 2011)). "The court considering a motion for summary judgment must consider the pleadings, depositions, answers to interrogatories, and admissions on file, together with affidavits, if any, in the light most favorable to the party opposing the motion." *Troche* 814 F.3d at 798 (quoting *Adams v. Metiva*, 31 F.3d 375, 378 (6th Cir. 1994)). We may not "weigh the evidence or make credibility determinations." *Troche*, 814 F.3d at 798. To defeat summary judgment "the nonmoving party 'must present significant probative evidence that will reveal that there is more than some metaphysical doubt as to the material facts.'" *Wiley v. City of Columbus, Ohio*, 36 F.4th 661, 667 (6th Cir. 2022) (quoting *Miller v. Maddox*, 866 F.3d 386, 389 (6th Cir. 2017) (internal quotation marks omitted).

Officers acting under color of state law are entitled to qualified immunity against § 1983 liability where "their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Pearson v. Callahan*, 555 U.S. 223, 232 (2009) (quoting *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982)). "A right is 'clearly established' for qualified immunity purposes if 'it would be clear to a reasonable officer that his conduct was unlawful in the situation he confronted.'" *Humphrey v. Mabry*, 482 F.3d 840, 847 (6th Cir. 2007) (quoting *Saucier v. Katz*, 533 U.S. 194, 202 (2001)). "The plaintiff bears the burden of demonstrating a constitutional violation and a clearly established right at the time of the incident." *Wiley*, 36 F.4th at 669. When several defendants are named, each officer's § 1983 liability is analyzed individually based on the officer's own conduct. *Id.*

Appellants' primary argument is that the officers lacked probable cause when they searched the Green House for the third time and, therefore, they violated Appellants' rights under the Fourth Amendment. Appellants argue that "the Affidavit in Support of a Search Warrant . . . was defective, as it lacked the appropriate elements for issuance of a search warrant. Specifically,

there was no [showing] of reasonable or probable cause in support of the search warrant." Appellant Br. at 8.

The Fourth Amendment provides that "no warrants shall issue, but upon probable cause, supported by oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized." U.S. Const. amend. IV. "Probable cause exists 'when there is a fair probability . . . that contraband or evidence of a crime will be found in a particular place.'" *United States v. Thomas*, 605 F.3d 300, 307 (6th Cir. 2010) (quoting *United States v. Helton*, 314 F.3d 812, 819 (6th Cir. 2003) (internal quotation marks omitted)). "In other words, a magistrate need only find 'reasonable grounds for belief' that evidence will be found in order to justify the issuance of a search warrant." *Id*. (quoting *United States v. Bennett*, 905 F.2d 931, 934 (6th Cir. 1990). In *Thomas*, we upheld the issuance of a search warrant based on a confidential informant's purported observation that the defendant "had a reputation within the marijuana community of Nashville" and that the defendant had sold "marijuana to customers on at least three occasions." *Id*. at 304. Appellants highlight our characterization of the search warrant affidavit in *Thomas* as "offering relatively thin justification for probable cause," *id.* at 308, and argue that the evidence in *Thomas* was "far superior, even on the most objective analysis, than the information provided by Defendant, Officer Wright, in his May 18, 2018 affidavit," Appellant Br. at 11. We are not persuaded.

To begin, *Thomas* is distinguishable. In *Thomas*, the search warrant relied in large part on information relayed to a DEA agent by a confidential informant. *Thomas*, 605 F.3d at 304. As we explained in *Thomas*, "[w]hen an affidavit relies on hearsay information from a confidential informant, the judicial officer (and reviewing court) must consider the veracity, reliability, and basis of knowledge for that informant as part of the totality-of-the-circumstances review." *Id*.

And we noted in our analysis that the affidavit provided "'with some detail' the informant's positive prior record of giving accurate information to the police" and that the "police corroborated significant parts of the informant's story." *Id*. at 308.

Here, Wright's affidavit did not contain hearsay from a confidential informant, and instead relied on Wright's own observations as well as inferences drawn from his prior experience as a member of the Detroit Police Major Violators Unit working on controlled-substance investigations. Wright's affidavit provided sufficient evidence from which the magistrate could find "'reasonable grounds for belief' that evidence [would] be found" at the Green House. *Id.* at 307. Specifically, the affidavit included information that the Green House did not have a valid license to operate as a dispensary, and that, despite a court order, it was still not in compliance with state and city licensing requirements, but nevertheless appeared to be operating. The affidavit also stated that Wright had personally conducted surveillance on two separate occasions after the second search and shortly before the warrant application, and although the Green House was supposed to be closed for business, it appeared that individuals were still entering the premises and then departing after only a few minutes. The affidavit included information that on two prior occasions, based on similar evidence, DPD had searched the Green House and had seized significant quantities of marijuana. The fact that additional evidence was recovered from the Green House during the April search indicated that, despite the search in March, the Green House had continued to sell marijuana illegally. Based on the facts recited, the issuing magistrate had "reasonable grounds for belief" that contraband or other evidence of a crime would be found at the Green House. Accordingly, the district court did not err in concluding that the third search warrant

was supported by probable cause and that the search did not violate Appellants' Fourth Amendment rights.[2] The officers were therefore entitled to qualified immunity against this claim.

As the district court noted, Appellants' strongest argument is that their Fourth Amendment rights were violated when their vehicles and personal possessions were seized. As Appellants explain, "Hugan's motor vehicle and cash were seized from him and Plaintiff Williams'[s] handgun and motor vehicle, along with cash were seized, despite the fact that there was no question that both Plaintiffs were merely acting as security guards at the premises." Appellant Br. at 15.

Assuming such actions would constitute unconstitutional seizures under the Fourth Amendment, the district court explained that there is no evidence that Officers Wright, Morrison or Gardner personally engaged in the unconstitutional seizures. The record evidence suggests that Officers Paul and Harris—both dismissed from this action—were responsible for the seizures of the vehicles and cash. In Harris's "Reporting Officer Narrative," he recounts that Officer "Paul forfeited a black 2008 Ford Edge . . . from Mr. Williams" and that

> [w]hile conducting an inventory search of the Vehicle, P.O. Paul discovered a black backpack on the driver's side rear seat. Inside the backpack was a wallet belonging to Mr. Williams with ID and an unknown sum of currency. P.O. Paul turned the currency over to Sgt. Harris for [tally]. Also inside the backpack was a Glock mod 42 . . . loaded with numerous live rounds. P.O. Paul forfeited a

---

[2] Appellants briefly argue that "evidence shows that there is a question of fact of whether or not Defendant Officer Wright lied, or showed reckless disregard of the truth, when submitting the affidavit in support of a search warrant." Appellant Br. at 15. In the criminal context, the Supreme Court has held that a challenge to the veracity of a search warrant requires a "substantial preliminary showing" that the affiant made an intentionally false statement, or a statement made with reckless disregard of the truth. *Franks v. Delaware*, 438 U.S. 154, 155 (1978) If that showing is made, the defendant may be granted a hearing, at which the defendant has the burden to prove the "allegation of perjury or reckless disregard" by "a preponderance of the evidence" before the search warrant will be voided. *Id.* at 156. The *Franks* test does not cleanly lend itself to the civil context. In any event, Appellants have not presented any evidence, much less a "substantial preliminary showing," that Wright made intentionally false statements, or statements made with a reckless disregard for the truth, in support of the May 18, 2018 search warrant application. Accordingly, we reject this argument as well.

> black 2001 Chevy Tahoe . . . from Mr. Hugan . . . While conducting an inventory
> search of the Tahoe P.O. Paul recovered an unknown sum of US currency

and "turned over the currency to Sgt. Harris for tally. P.O. Paul placed the vehicles and firearm on evidence." (R.23-7, PID 194.) The report concludes, "Sgt. Harris forfeited the following monies: $2606.00 in assorted U.S. currency from Mr. Rhone, which was located in the cash register." (*Id.*)

To establish liability for violations under 42 U.S.C. § 1983, there must be a showing that defendants "personally participated in the actions that violated [the plaintiff's] Fourth Amendment rights." *Bey v. Falk*, 946 F.3d 304, 315 (6th Cir. 2019) An officer's "mere presence at the scene of a search, without a showing of direct responsibility for the action, will not subject an officer to liability." *Burley v. Gagacki*, 729 F.3d 610, 620 (6th Cir. 2013).[3] In *Burley*, we held that where record evidence "overwhelmingly indicate[d]" that certain officers were not part of an entry team, and their participation was limited to perimeter security, the officers could not be held liable for excessive force used by the officers who entered the home. *Id. Bey* is similarly instructive. There, Bey filed suit under § 1983 for violations of his Fourth Amendment rights against several undercover officers who, after following Bey in an unmarked car, arrested him on suspicion that he had engaged in retail fraud. *Bey*, 946 F.3d at 311. We concluded that some of the undercover officers were not entitled to qualified immunity on the Fourth Amendment claims because these officers directed a stop without reasonable suspicion. *Id*. at 313. But we found that Officer

---

[3] Although we have determined "that even an officer who is present at the scene of a search is not subject to liability 'without a showing of direct responsibility for the action,'" *Gardner v. Evans*, 920 F.3d 1038, 1051 (6th Cir. 2019) (quoting *Ghandi v. Police Dep't of City of Detroit*, 747 F.2d 338, 352 (6th Cir. 1984)), an officer may nonetheless be liable for his or her failure to intervene or protect where the offending officer owed a duty of protection. *See Turner v. Scott*, 119 F.3d 425, 429 (6th Cir. 1997) (noting that "[i]t is clear that there are circumstances under which police officers can be held liable for failure to protect a person from the use of excessive force")

McAteer was entitled to qualified immunity, although she was "present throughout the events" and had provided information to the undercover officers, because her conduct did not amount to "direct responsibility" for the underlying Fourth Amendment violations and she also "reported that Bey and his friends in fact paid for the merchandise before they left the store." *Id.* at 315-16.

Here, Appellants have presented evidence that Wright, Morrison, and Gardner were present for the search, but we have already determined that the search itself did not violate Appellants' Fourth Amendment rights. Appellants point to no evidence that Wright, Morrison, or Gardner were involved in the seizure of their property; the evidence in the record suggests that only Paul and Harris were responsible for the seizures. Appellants argue that "merely because Defendant Officer Paul is the individual that signed the paperwork for Plaintiffs' vehicles and Plaintiff Williams' handgun, and Defendant Officer Harris seized Plaintiffs' cash and wrote the actual citation for loitering, which was later dismissed, does not mean the other Defendant Officers were 'merely present.'" Appellant Br. at 17. This is true, of course, but Appellants mischaracterize the evidence. Harris's Reporting Officer Narrative explains that Paul seized the vehicles and the items in the vehicles, while Harris seized the cash. Appellants point to no evidence that defendant officers were involved. In fact, neither Hugan nor Williams testified at their depositions that Wright, Morrison, or Gardner were involved in the seizures. At best, Williams testified that Morrison was the officer who was "yelling at me in my face," but when asked later about the seizure of his vehicle and firearm, he noted only that "one of the officers asked who the black car belonged to." (R.23-10, PID 275, 277.) But a "mere scintilla" of evidence is not enough to withstand summary judgment. *Brown v. Battle Creek Police Dep't*, 844 F.3d 556, 565 (6th Cir. 2016). Accordingly, the district court was correct to reject this argument as well.

Because the district court did not err by granting summary judgment to the remaining officers, we AFFIRM.