RECOMMENDED FOR PUBLICATION
Pursuant to Sixth Circuit I.O.P. 32.1(b)

File Name: 24a0243p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

─────────────────

HUSSEIN NAJI, personal representative of the estate of
Ali Naji,

                    *Plaintiff-Appellant*,

    *v.*

CITY OF DEARBORN, MICHIGAN; TIMOTHY CLIVE,
Corporal,

                    *Defendants-Appellees*.

No. 24-1058

─────────────────

Appeal from the United States District Court for the Eastern District of Michigan at Flint.
No. 4:23-cv-10521—F. Kay Behm, District Judge.

Decided and Filed:  October 28, 2024

Before:  SUTTON, Chief Judge; LARSEN and MURPHY, Circuit Judges.

─────────────────

## COUNSEL

**ON BRIEF:**  Amir I. Makled, HALL MAKLED, P.C., Dearborn, Michigan, for Appellant. Gary K. August, Michel C. Lewis, AUGUST LAW, PLLC, Troy, Michigan, for Appellees.

─────────────────

## OPINION

─────────────────

LARSEN, Circuit Judge.  Ali Naji walked into a Dearborn police station, pulled out a gun, and tried to shoot Corporal Timothy Clive.  But Naji's gun malfunctioned and would not fire.  While Naji tried to fix his malfunctioning gun, Clive shot and killed Naji.  Hussein Naji, as personal representative of Naji's estate, sued both Clive and the City of Dearborn, bringing federal claims under 42 U.S.C. § 1983 and state tort claims.  The district court granted summary judgment to Clive and the City on all claims.  For the following reasons, we AFFIRM.

I.

On December 18, 2022, Ali Naji walked into the City of Dearborn Police Headquarters, while Corporal Timothy Clive was on duty. The police lobby was accessible by six separate entrances, including one public entrance, and the incident was captured on five surveillance cameras. The surveillance footage shows Naji entering the lobby through the public entrance, wearing a COVID face mask and a winter hat. Clive, who was standing at the lobby's front desk behind bulletproof glass, asked Naji how he was doing. Naji did not answer; instead, with his right hand, he pulled a handgun from his waistband and pointed it at Clive. Clive shouted "gun, gun, gun!" Naji pulled the trigger, but the gun malfunctioned, and no bullet fired. The gun "clicked" and Naji pulled out the magazine, seemingly trying to fix the malfunctioning weapon. Clive retrieved his service revolver, "slid open the front desk window and fired seventeen shots in a continuous, 4-5 second volley." *Naji v. City of Dearborn*, 709 F. Supp. 3d 398, 404 (E.D. Mich. 2023). When Clive opened fire, Naji was holding the gun about chest-high and pointing it towards Clive; approximately six seconds had passed since Naji had first attempted to shoot Clive. Naji fell to the floor, dropping his gun as he fell. On the floor, the video shows Naji contorting once, appearing to roll onto his side, before he stops moving. No members of the public were in the lobby during the shooting, but eleven or so people were working at the station that day.

Hussein Naji, as personal representative of Ali Naji's estate, sued both Clive and Dearborn in federal district court. Naji's representative brought the following claims: (1) a Fourth Amendment excessive force claim under § 1983; (2) a municipal-liability claim against Dearborn; (3) assault and battery under Michigan law; and (4) gross negligence under Michigan law.[1] The district court granted summary judgment to Clive and the City on all claims. Naji's representative timely appealed. On appeal, both defendants also moved for sanctions under Federal Rule of Appellate Procedure 38 and 28 U.S.C. §§ 1912, 1927.

---

[1]Naji originally brought two more claims under the Michigan Persons with Disabilities Civil Rights Act and the Freedom of Information Act. The district court held that Naji had abandoned those claims, and he does not raise them on appeal.

II.

We review a district court's grant of summary judgment de novo. *Sigley v. City of Parma Heights*, 437 F.3d 527, 532 (6th Cir. 2006). Summary judgment is appropriate when there is no genuine dispute of material fact, and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a). We construe the evidence and make all reasonable inferences in favor of the nonmoving party. *Raimey v. City of Niles*, 77 F.4th 441, 447 (6th Cir. 2023). That said, "[w]hen the record contains 'a videotape capturing the events in question,' we may not adopt a 'version of the facts for purposes of ruling on a motion for summary judgment' that 'blatantly contradict[s]' the asserted version of events such that 'no reasonable jury could believe it.'" *Id.* (second alteration in original) (quoting *Scott v. Harris*, 550 U.S. 372, 380 (2007)). The video's "gaps or uncertainties" should be construed in the nonmovant's favor. *Latits v. Phillips*, 878 F.3d 541, 544 (6th Cir. 2017).

III.

A.

Corporal Clive raised the defense of qualified immunity. To overcome that defense, Naji's representative must show that (1) Clive violated his constitutional rights; and (2) those rights were clearly established at the time of the violation. *See Ashcroft v. al-Kidd*, 563 U.S. 731, 735 (2011). The district court held that Clive did not violate the Constitution. We agree.

Naji's representative claims that Clive used excessive force against Naji, in violation of the Fourth Amendment. To determine whether an officer's use of force was excessive, we ask whether his actions were "'objectively reasonable' in light of the facts and circumstances confronting [him], without regard to [the officer's] underlying intent or motivation." *Graham v. Connor*, 490 U.S. 386, 397 (1989). The use of deadly force is objectively reasonable when an officer possesses "probable cause to believe a suspect poses an immediate threat of serious physical harm to the officer or others." *Lee v. Russ*, 33 F.4th 860, 863 (6th Cir. 2022). And we must consider that officers often "make split-second judgments" in dangerous and difficult circumstances about how much force is necessary. *Graham*, 490 U.S. at 396–97. Thus, whether

an officer's use of force was reasonable must be judged from the officer's perspective in the moment "rather than with the 20/20 vision of hindsight." *Id.* at 396.

Clive's use of deadly force was lawful. Clive had probable cause to believe Naji posed an immediate threat of serious physical harm. Naji walked into the station, pointed his gun at Clive, and pulled the trigger. Then Clive shot Naji, while Naji held his malfunctioning gun chest-high, still pointed toward Clive, seemingly trying to fix the weapon. "Time and time again, we have rejected Fourth Amendment claims in this setting—when the officers used deadly force only after the suspects had aimed their guns at the officers or others." *Presnall v. Huey*, 657 F. App'x 508, 512 (6th Cir. 2016) (citing *Boyd v. Baeppler*, 215 F.3d 594, 598, 604 (6th Cir. 2000); *Est. of Sowards v. City of Trenton*, 125 F. App'x 31, 38–39 (6th Cir. 2005); *Whitlow v. City of Louisville*, 39 F. App'x 297, 300, 306 (6th Cir. 2002)); *see also Jordan v. Howard*, 987 F.3d 537, 543–44 (6th Cir. 2021). This case is no different: Clive's use of deadly force was objectively reasonable.

Naji's representative offers several responses. The first is that Naji did not pose an immediate threat. Naji's representative claims there was no danger because: (1) when Clive fired, Naji was fixing his gun rather than pointing it at Clive or anyone else; (2) Clive was standing behind bulletproof glass; (3) Clive could not remember when he last saw a civilian in the police station before the shooting; (4) Naji never actually *fired* a bullet; (5) Naji did not try to flee; and (6) Clive continued to shoot Naji after Naji fell. Naji's representative claims that Clive should have tried to de-escalate the situation or warn Naji before resorting to lethal force.

This argument fails. It was objectively reasonable for Clive to believe that Naji posed an immediate threat of serious physical harm. Legal doctrine and common sense both recognize that "[w]hen a person aims a weapon in a police officer's direction, that officer has an objectively reasonable basis for believing that the person poses a significant risk of serious injury or death." *Greathouse v. Couch*, 433 F. App'x 370, 373 (6th Cir. 2011).

Naji's representative claims that "Naji was not pointing the gun at Clive or any other person while Clive shot him," Corrected Appellant Br. at 18, but the video evidence directly contradicts this account. Naji was holding his gun chest-high and fidgeting with the weapon—

apparently trying to fix it so he could refire.  The weapon was pointed toward Clive.  The district court agreed, finding that Naji was pointing his gun "at about a 45-degree upward angle toward Clive and [wa]s pulling back the weapon's slide and turning the barrel directly toward Clive." *Naji*, 709 F. Supp. 3d at 409.  And it does not matter that Clive was behind bulletproof glass.  Like our sister circuits, we reject the conclusion that "bulletproof" glass dispels all danger.  *See United States v. Whitfield*, 695 F.3d 288, 304 n.11 (4th Cir. 2012) ("[W]e join the Second and Eleventh Circuits in rejecting the contention that bank tellers are not jeopardized simply because they are situated behind 'bulletproof' glass.").

It was also reasonable for Clive to believe that Naji posed an immediate risk of harm *to others*.  There were six entrances to the lobby, many other officers were present in the station, and the shooting occurred "on a busy Sunday during a Christmas toy drive." *Naji*, 709 F. Supp. 3d at 411.  An officer or member of the public could have walked into the lobby at any moment.  It does not matter that Clive, at his deposition, did not remember the last time prior to the shooting that someone had entered the station.  Nor does it matter that Naji did not try to flee, given the obvious danger he posed to both Clive and the public.

Clive's response was also reasonable.  Naji pointed his gun at Clive and pulled the trigger; Clive responded immediately by retrieving his own gun and shooting Naji.  Just as an officer "need not wait for a suspect to open fire on him . . . before the officer may fire back[,]" *Greathouse*, 433 F. App'x at 373, an officer who has already been fired on (unsuccessfully) need not pause to give an assailant time to reload or repair his gun.  A mere six seconds transpired between Naji attempting to fire and Clive returning fire.  That matters too.  *Graham* reminds us that officers often "make split-second judgments" in "uncertain[] and rapidly evolving" situations.  490 U.S. at 396–97.  That was certainly the case here.

Second, Naji's representative argues that the district court erred by paying insufficient attention to Naji's alleged mental illness.  But regardless of whether Naji was mentally ill, Clive did not act unreasonably by resorting to lethal force.  Our precedent makes that clear.  In *Palma v. Johns*, this court held that a defendant's "diminished capacity" from mental illness can factor into the totality of the circumstances in an excessive-force claim.  27 F.4th 419, 436–37 (6th Cir. 2022).  But we explained that this factor is relevant only if the officer knew, or had reason to

know, of the suspect's mental illness. *Id.* For example, in *Palma*, the dispatcher told the responding officer that Palma was a "Code 76," meaning a person with mental illness. *Id.*

Here, Naji's alleged mental illness fails to create any genuine dispute regarding a material fact. There is no genuine dispute as to whether Clive knew Naji *at all*, let alone that he was mentally ill. Clive testified that he did not recognize Naji, who wore a mask and did not say a word during the encounter. Naji's representative suggests that the Dearborn police had "every possibility . . . to know Naji and his mental health," noting that Naji once received police assistance after a mental-health episode. Corrected Appellant Br. at 15. But he never asserts, much less supplies evidence, that *Clive* recognized Naji or knew of his mental illness. And, in any event, officers can use lethal force "against a mentally ill person who," like Naji, "was armed and threatening." *Palma*, 27 F.4th at 437 (emphasis omitted). Naji's mental illness does not render Clive's actions unreasonable.

In sum, no constitutional violation occurred because Clive's actions were objectively reasonable. Therefore, Clive is entitled to qualified immunity. And while Naji's representative also brought a § 1983 claim against the City of Dearborn alleging municipal liability, the City cannot be held liable because there was no underlying constitutional violation. *See, e.g.*, *Gaddis ex rel Gaddis v. Redford Township*, 364 F.3d 763, 777 (6th Cir. 2004).

B.

Naji also brought claims for assault and battery and gross negligence under Michigan law. To qualify for immunity under Michigan law, an officer must show that (1) he acted during the course of employment and within the scope of his authority; (2) he acted in good faith; and (3) his actions were discretionary, not ministerial. *Odom v. Wayne County*, 760 N.W.2d 217, 218 (Mich. 2008). Unlike under federal law, the standard is subjective. *Shumate v. City of Adrian*, 44 F.4th 427, 451 (6th Cir. 2022). So an officer who believed in good faith that the force used was necessary is protected from liability for an assault and battery claim; whereas, an officer who acted with malicious intent is not. *Bletz v. Gribble*, 641 F.3d 743, 757 (6th Cir. 2011).

Naji's representative disputes only whether Clive acted in good faith. But the facts do not give rise to any genuine dispute. Under Michigan law, an officer may use lethal force to defend himself or another, and an officer's use of such force is in good faith when he fires after seeing the assailant aim either at himself or another. *Ealey v. City of Detroit*, 375 N.W.2d 435, 439 (Mich. Ct. App. 1985); *see also Presnall*, 657 F. App'x at 513. No reasonable juror could find that Clive acted with malice. Clive fired only after Naji tried to shoot him, while Naji was actively trying to fix his weapon. Clive is immune from assault and battery claims under Michigan law.

Now gross negligence.[2] Michigan law "has rejected attempts to transform claims involving elements of intentional torts into claims of gross negligence." *VanVorous v. Burmeister*, 687 N.W.2d 132, 143 (Mich. Ct. App. 2004), *overruled in part on other grounds by Odom*, 760 N.W.2d 217. Gross negligence is cognizable under Michigan law only when not "fully premised on" an intentional-tort claim. *Id.* We have repeatedly applied that principle to bar excessive-force claims disguised as gross-negligence claims. *See Bletz*, 641 F.3d at 756; *Livermore ex rel. Rohm v. Lubelan*, 476 F.3d 397, 408 (6th Cir. 2007); *Presnall*, 657 F. App'x at 513.

Naji's representative contends that his gross-negligence claim is independent from his assault and battery claims. Dearborn Police Department policy, he says, requires an officer to give a verbal warning before resorting to lethal force, which Clive failed to do. Thus, Naji says his gross-negligence claim is premised not on the assault and battery, but on Clive's failure to follow department policy.

Even assuming this is a viable theory, Naji's claim still fails. In *Brent v. Wayne County Department of Human Services*, we dismissed a gross-negligence claim against Detroit and its officers because the plaintiffs failed to identify any legal rule "impos[ing] a duty running from Detroit police officers to private citizens requiring the officers to abide by internal departmental policies." 901 F.3d 656, 701 (6th Cir. 2018). So too here: Naji's representative does not explain how Clive owed Naji a duty to follow departmental policy. He asserts that "law

---

[2]Michigan law does not immunize officers for grossly negligent conduct. Mich. Comp. Laws § 691.1407(2)(c).

enforcement officers should follow procedures or statutory obligations of the Police Department." Corrected Appellant Br. at 33. But he identifies no legal authority for the proposition that failure to do so makes an officer liable in tort. Thus, even assuming that Naji's gross-negligence claim is not fully premised on underlying intentional conduct, it raises no genuine issue of material fact.

* * *

We AFFIRM.