NOT RECOMMENDED FOR PUBLICATION
File Name: 26a0204n.06

No. 25-3750

UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT

FILED
May 05, 2026
KELLY L. STEPHENS, Clerk

JOSEPH FRASURE and LISA FISHER, individually and as Co-Administrators of the Joe Frasure Estate, deceased,

      Plaintiffs-Appellants,

v.

CITY OF WYOMING, OHIO; DREW JONES; JORDAN BATTS; RYAN WARMACK,

      Defendants-Appellees.

)
)
)
)
)
)
)
)
)
)
)
)

ON APPEAL FROM THE UNITED STATES DISTRICT COURT FOR THE SOUTHERN DISTRICT OF OHIO

OPINION

Before: KETHLEDGE, WHITE, and LARSEN, Circuit Judges.

**HELENE N. WHITE, Circuit Judge.** Plaintiffs Joseph Frasure ("Frasure") and Lisa Fisher ("Fisher"), individually and as co-administrators of their son Joe Frasure Jr.'s ("Joe") estate, brought this action against police officers Drew Jones ("Jones"), Jordan Batts ("Batts"), and Ryon Warmack ("Warmack," together "Officers") and the City of Wyoming, Ohio ("City," referred to as "Defendants" together with "Officers") for claims arising out of the fatal officer-involved shooting of their son Joe. Frasure[1] appeals orders excluding his expert witness, granting summary judgment in favor of Defendants, and denying his motion for partial summary judgment. We AFFIRM.

## I.    Facts

Joe's grandmother died on January 6, 2023. During the afternoon of January 29,

---

[1] We follow the parties' approach and refer to Plaintiffs Frasure and Fisher as "Frasure" collectively when referring to them in their capacity as Plaintiffs.

2023, Frasure, Joe, and other family members went to clean out her apartment, a top-floor unit of a two-story, four-unit apartment building at 320 Durrell Avenue in Wyoming, Ohio.[2] Several Wyoming police officers were in the building's vicinity while the family was cleaning out the apartment. At around 11:45 p.m. that day, and under the impression that the unit needed to be emptied to receive the security deposit, Frasure and Joe returned to the building to meet Joe's sister and continue the clean out.

Shortly after midnight on January 30, 2023, Jerome Guest, a neighbor, called what he believed to be a non-emergency City line.[3] Guest reported that, although he understood that 320 Durrell "was supposed to be vacant," he could see people "walking around it and doing maybe suspicious things at a late hour" including people "walking around in the window" and "flashlights in the basement." R. 9-1, Ex. C, 0:27–1:03. Guest did not affirmatively mention a potential burglary but, when asked by dispatch "how many people are trying to break into the house," Guest reported seeing two or three people. *Id.* at 1:26–1:45. Because he could only see silhouettes, he was unable to provide descriptions.

The call was dispatched to the Wyoming Police "to investigate a group of two three subjects attempting to break into the vacant residence" at 320 Durrell but with the note that the caller was unable to provide a description and could only see silhouettes. R. 9-1, Ex. D, 0:03–0:38. The Officers responded to the dispatch call in police cars, though they approached

---

[2] According to Plaintiff Fisher, at some point after the grandmother's death, her brother (Joe's uncle) told Wyoming Police employees at the City precinct that family members would be removing the grandmother's belongings but did not specify a particular date or time.

[3] Although he indicated to the answering agent that he was "trying to call the Wyoming non-emergency line," Guest called the Hamilton County police dispatch. R. 9-1, Ex. C, 0:03–0:12.

320 Durrell on foot. Each wore a body-worn camera ("BWC")[4] and a uniform with a police badge and other police indicia. All three Officers had been previously dispatched to 320 Durrell for other calls including domestic-violence incidents, thefts, break-ins, and a drug-related shooting. Although Warmack and Batts were aware that an elderly tenant in the building had recently died, and Warmack knew that the building was in some stage of condemnation, there is no evidence that any of the Officers knew that family members were cleaning out the apartment unit.

Warmack arrived at 320 Durrell at approximately 12:41 a.m. He initially walked past the front of 320 Durrell and up the driveway between 320 Durrell and 322 Durrell. In the paved area behind 320 Durrell, Warmack observed two parked cars, including a silver van. He then walked back down the driveway toward the street and up a few steps to 320 Durrell's front door, which he tried to open but found locked. He heard indiscernible voices inside, and observed that the basement, upper unit, and lower right unit were illuminated.[5] As he descended the front steps, Warmack said "I got people inside." Warmack BWC, 00:43:10–43:14.[6] When he tried to open the door, Warmack did not identify himself as an officer.

Jones and Batts arrived at 320 Durrell at the same time as Warmack but from the opposite direction. Jones and Batts observed lights on in an upper unit, lower unit, and the basement, and the silhouettes of people in an upstairs unit. Standing on the side of the building further away from 322 Durrell, they called dispatch to ask if the caller had identified which apartment was being burglarized. As they awaited an answer, Batts hypothesized that "it had to be the upstairs one

---

[4] Both Plaintiffs and Defendants entered the BWC footage into the record. *See* R. 9-1, Ex. E, ID #X60311664 ("Warmack BWC"); R. 9-1, Ex. F, ID #X60317296 ("Batts BWC"); R. 9-1, Ex. G, ID #X60317846 ("Jones BWC"); *see also* R. 50, Exs. K-M (same). All three BWCs record virtually the same period.

[5] In an affidavit submitted in support of Defendants' motion for summary judgment, Warmack attested that he had "see[n] shadows in the front-right apartment . . . which suggested there were individuals accessing the lower-level of the building." R. 49-4, PID 1610. This was not captured in Warmack's body-camera footage.

[6] It is not clear if Warmack was speaking into his radio or to Jones and Batts.

because the old lady died." Jones BWC, 00:42:15–20. Batts and Jones observed someone looking out of the upper-left unit's window and heard a bang-like noise and voices inside. Later in his deposition, Jones testified that he "heard someone ma[k]e a statement that they understood that law enforcement was outside and they could hear [Jones and Batts] talking," but this is not discernible on either Batts' or Jones' body-camera footage. R. 42-1, PID 720.

Batts and Jones then moved toward the building's front and saw an individual at the window of an upper unit and Warmack descending the front steps. Jones walked up to the front door and tried to open it but also found it locked. Jones later testified during his deposition that he "saw someone running down the steps" through the opaque glass door panel, and that "someone passed by the door window," but this is not captured by his body-camera footage. *Id.* at PID 721. While Jones was at the front door, Batts asked "do you want to order them out, we can order them out, the window's open," to which Jones did not respond. Batts BWC, at 00:43:38–46. Like Warmack, Batts and Jones never identified themselves.

At around 12:43 a.m., Warmack headed back up the driveway. As he approached the rear of 320 Durrell, his pace quickened, and he yelled "Back." Warmack BWC, 00:43:45–51. Still at the building's front, Jones and Batts heard Warmack and started to run up the driveway, Jones with his weapon drawn.[7] Warmack ran toward the paved area at the back of the building where he saw Frasure standing next to a silver van with his hands in the air. Warmack shouted "hey, stop" at Frasure. Warmack BWC, 00:43:54. Frasure then appears to have dropped at least one hand to his waist before Warmack commanded him to "put your hands in the air," after which

_____

[7] In an interview conducted a few days after the incident, Jones said he only "faintly hear[d]" Warmack yelling "back." R. 9-1, Ex. K, 15:30:20–41. However, in affidavits submitted for summary judgment, both Jones and Batts averred that they perceived Warmack's voice to be "strained" or conveying "a sense of urgency." R. 49-5, PID 1619; R. 49-6, PID 1628.

Frasure raised and kept his hands up. *Id.* at 43:55–58. Throughout, Frasure repeatedly said "I ain't going nowhere." Warmack BWC, 00:43:52–44:00. During this initial encounter, Warmack unholstered his firearm. Although not evident from the body-camera footage, according to Frasure's testimony, Warmack pointed his gun at him.[8] When Jones and Batts arrived a few seconds later, they stood by the rear of 320 Durrell with their firearms pointed at Frasure for several seconds.

As Warmack approached Frasure, he saw Joe in the van's driver's seat and pointed his firearm at him.[9] The sound of the van's ignition can be heard on the body-camera footage after which Warmack moved toward the front of the van with his weapon drawn. He repeatedly yelled "stop" and ordered Joe to "get out of the car now." Warmack BWC, 00:44:00–02. The van reversed until it ran into an obstruction and stopped momentarily, and then the engine revved and the van began accelerating forward. Warmack appears to have been a few feet in front of the van when it began moving forward and he jumped out of the way to avoid being hit. Warmack later testified that he perceived the van as a threat but did not fire his weapon because "[he] knew [he] could jump out of the way." R. 40-1, PID 520. The entire time the van was moving forward, Warmack continued to yell commands for Joe to stop the car and for Joe to get out of the car, including once the van had passed him.

When the van began to reverse, Batts ran in front of Jones and descended the grassy hill between the driveway and the paved area. As Batts descended, Jones said "we got a vehicle taking

---

[8] Warmack testified that he had initially placed his firearm at a low ready position and denied pointing it at Frasure. Construing the facts in Frasure's favor, however, the magistrate judge assumed that Warmack did point his firearm at Frasure during their initial encounter.

[9] When interviewed a few hours after the incident, Frasure said that Joe was fleeing because he had an outstanding warrant for absconding. R. 49-21, Ex. 4, 4:07:31–41; 04:12:25–30. However, later in his deposition, Frasure denied that Joe was wanted. R. 44-1, PID 1006. Frasure does not offer another explanation for why Joe attempted to evade arrest.

off, silver van, one at gunpoint." Jones BWC, 00:44:02–05. When the van accelerated forward, Batts was positioned behind Warmack and, with his firearm raised at the van, repeatedly told Warmack to "back up" and "be careful." Batts BWC, 00:44:01–10. Jones, who was still by the rear of 320 Durrell, also witnessed the van accelerating forward and yelled at Warmack to back up. Jones later testified that the car "almost ran over" Warmack and that, because he saw Warmack's "flashlight spin around," he "wasn't sure if [Warmack] had been side-swiped" by the van. R. 42-1, PID 721.

After the van passed Warmack, Joe honked its horn and continued driving forward. The van accelerated toward the grassy hill, where Batts was standing, and in the direction of the driveway. Batts turned and ran up the grassy hill to the driveway toward the back corner of 322 Durrell. Jones ran close to the inside wall of 320 Durrell with his weapon raised at the van.

The van continued driving forward and appeared to turn toward the driveway. At 12:44:14 a.m., after the van cut close to him, Jones fired one shot. In an interview conducted three days after the shooting, Jones recalled initially thinking he was in "a pretty okay spot" until the van turned toward the driveway. R. 9-1, Ex. K, 15:35:06–34. Jones said that as the van turned toward the driveway, he had "lost track" of Batts but that Batts was "definitely in front of the van . . . somewhere on the right side." *Id.* at 15:36:04–13. In his deposition, Jones stated he shot because he "fear[ed] f[or] [his] life and was certain Officer Batts was going to be struck" and that he "had to try to stop the threat toward the van, the person driving the van, who was about to strike Officer Batts." R. 42-1, PID 722.

At approximately the same time as Jones, Batts fired his weapon three times. When Batts fired his weapon, the van's tires were turned away from him. In his initial interview, Batts stated that he was "running sideways" and saw the van "moving directly at [him]" when he discharged

his weapon. R. 9-1, Ex. J, 16:07:27–55. Later in his deposition, Batts testified that, before shooting his weapon, he "could sense the van gaining" on him, that it was only a few feet away, and that he was "running for [his] life." R. 49-6, PID 1630–31. Batts stated that he felt "that [he] would be crushed by [the] van into 322 Durrell" or sideswiped and that "the firing of [his] firearm is what saved [his] life." *Id.* at PID 1631.

Just over three minutes elapsed between when the Officers arrived at 320 Durrell and when the shooting occurred. There were only 30 seconds between when Warmack initially saw Frasure and Joe in the paved area and when Batts and Jones discharged their weapons, less than 15 seconds between when the van initially started reversing and the shooting, and around five seconds between when the car began accelerating forward and when Jones and Batts discharged their weapons.

After the shooting, the van crashed into 320 Durrell. While Warmack moved toward the van, Batts returned to the rear of the driveway where he spotted Frasure still in the paved area. Batts pointed his flashlight and firearm at Frasure and repeatedly ordered him to "get down on the fucking ground." Batts BWC, 00:44:31–39. Frasure did not comply and approached the other vehicle in the paved area, leaning against its hood. Jones then pointed his firearm at Frasure, commanding him to get on the ground. Before Frasure complied, Jones said, "you're gonna get shot! On the ground!" Jones BWC, 00:45:00–03. As Frasure knelt with his hands up, he replied, "why you gonna shoot me for?" *Id.* at 45:05–15.

Joe was pronounced dead at 4:21 p.m. on January 31, 2023 at the University of Cincinnati Medical Center. The cause of death was recorded as a "gunshot wound of head," R. 48-5, PID 1515, and the post-mortem exam report stated that the bullet entered a few inches behind his left inner ear and traveled "left to right, back to front, and slightly do[w]nward," *id.* at 1514, 1517.

The Hamilton County Sheriff's Office Criminal Investigation Section conducted an

independent investigation into the shooting, which included a taped interview with Frasure a few hours after the incident, at which time Frasure did not know if Joe was alive. Frasure initially stated that neither Batts nor Jones were in danger but later said that Joe "may have been" close enough to Batts to run him over and that "if [he] was a cop [he]'d probably do the same thing." R. 49-21, Ex. 4, 04:06:57–07:01, 04:13:00–12. Later, at his deposition, Frasure testified that he did not remember the interview or "half of the stuff" he said because he "was scared to death they weren't going to let [him] go home" and that he told the officers "anything they wanted to hear so [he] could get to [his] son." R. 44-1, PID 977–78.

The investigation's findings were presented to the Hamilton County prosecutor who concluded that the Officers had acted in self-defense and, therefore, decided not to bring charges. The City then convened a Use of Force Review Board to conduct a further independent investigation. The Review Board "unanimously decided" that Jones' and Batts' actions were within department policy, including the policies "for the application of deadly force [and] the use of force at moving vehicles." R. 49-17, PID 1898. Brooke Brady ("Chief Brady"), the City's police chief, reviewed and accepted these findings.

## II.    Procedural History

On February 23, 2024, Frasure and Fisher, individually and as co-administrators of Joe's estate, sued the Officers and the City. Frasure raised eight claims. These included three Fourth Amendment excessive-force claims under 42 U.S.C. § 1983—(1) a claim against all of the Officers for pointing their firearms at Frasure and Joe prior to the shooting; (2) a claim against Jones for pointing his firearm at and threatening Frasure after the shooting;[10] and (3) a claim against Batts

---

[10] Frasure initially brought this claim against Batts but later filed an amended complaint substituting in Jones.

and Jones for their use of deadly force; various municipal constitutional claims under 42 U.S.C. § 1983 against the City;[11] related state-law claims for wrongful death against the City, Batts, and Jones; and negligence against all Defendants. The parties consented to the jurisdiction of a magistrate judge. After discovery, the parties filed cross-motions for summary judgment; Frasure sought summary judgment on the three excessive-force claims and Defendants sought summary judgment on all claims.

Defendants submitted the expert reports of a forensic analyst who performed a reconstruction of the Officers' use of force using photogrammetric and spectrographic audio analyses, a forensic criminologist and law enforcement practices expert, and an expert in policing and training. In support of his summary judgment motion, Frasure proffered the expert report of Dr. Lawrence Hunter ("Hunter"), a retired police captain from Connecticut, to opine on the Officers' use of force. Defendants moved to exclude Hunter's testimony for failure to comply with Federal Rule of Civil Procedure 26 because, in part, his report did not identify all the facts and data he considered in forming his opinion. Defendants further contended that Hunter's testimony was barred by Rule 702 because Hunter was unqualified to be an expert on excessive force, his opinion did not assist the factfinder, and his opinion was unreliable. The magistrate judge granted Defendants' motion, finding first that the Rule 26 errors were neither substantially justified nor harmless and, second, that although Hunter was qualified, his opinion would not assist the factfinder and was otherwise unreliable.

In a separate order, the magistrate judge granted Defendants' motion for summary

---

[11] Frasure initially asserted two of his three municipality claims (for ratification and failure to train) against all Defendants. At summary judgment, Defendants argued that these claims as asserted against the Officers must fail because municipal liability claims cannot be brought against individuals and were otherwise duplicative. Plaintiffs did not respond to this argument. The magistrate judge therefore considered the argument conceded and addressed these claims only as asserted against the City. Because Frasure does not appear to challenge this ruling on appeal, we consider the municipality liability claims against the City only.

judgment and denied Frasure's partial motion. The magistrate judge found that the Officers were entitled to qualified immunity for Frasure's three excessive-force claims because Frasure had not demonstrated a constitutional violation or a clearly established right and also granted summary judgment for Defendants on Frasure's municipal liability and state-law claims. This appeal followed.

### III.    Analysis

"We review grants of summary judgment and qualified immunity de novo." *Novak v. Federspiel*, 140 F.4th 815, 820 (6th Cir. 2025). Summary judgment is appropriate where "there is no genuine dispute [of] material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). "We view the evidence in the light most favorable to the nonmovant and draw all reasonable inferences in his favor." *Raimey v. City of Niles*, 77 F.4th 441, 447 (6th Cir. 2023). Where video evidence, like bodycam footage, captures the relevant events, we "may not adopt a version of the facts [that] blatantly contradicts the asserted version of events such that no reasonable jury could believe it," and are to construe any "gaps or uncertainties" in the videos in the nonmovant's favor. *Naji v. City of Dearborn*, 120 F.4th 520, 523 (6th Cir. 2024) (citation modified).

We review the magistrate judge's decision to exclude expert testimony for abuse of discretion, "recognizing, of course, that such review calls for deference to the district court's decision." *Conwood Co., L.P. v. U.S. Tobacco Co.*, 290 F.3d 768, 781 (6th Cir. 2002); *see also United States v. Rios*, 830 F.3d 403, 413 (6th Cir. 2016). We will reverse only if "we are left with a definite and firm conviction that [the district court] committed a clear error of judgment." *Conwood*, 290 F.3d at 781.

**A. Qualified Immunity**

Frasure challenges the magistrate judge's finding that qualified immunity barred all three excessive force claims. Qualified immunity "protects government officials from liability for civil damages insofar as their conduct does not violate clearly established statutory of constitutional rights of which a reasonable person would have known." *Pearson v. Callahan*, 555 U.S. 223, 231 (2009) (citation modified). The doctrine "balances two important interests—the need to hold public officials accountable when they exercise power irresponsibly and the need to shield officials from harassment, distraction, and liability when they perform their duties reasonably." *Id.* To overcome the Officers' qualified-immunity defense, Frasure must establish that "the evidence, viewed in the light most favorable to [him], would permit a reasonable juror to find that (1) the [Officers] violated a constitutional right; and (2) the right was clearly established." *Raimey*, 77 F.4th at 447 (citation omitted).

The Fourth Amendment's guarantee against unreasonable searches and seizures protects an individual's right not to be subjected to excessive force during an arrest, investigatory stop, or other seizure of his person. *Graham v. Connor*, 490 U.S. 386, 394 (1989); *see also* U.S. CONST. amend. IV. The question is whether the search or seizure was objectively reasonable under the circumstances in which it occurred "[t]aken in the light most favorable to the party asserting the injury," *Scott v. Harris*, 550 U.S. 372, 377 (2007), but as "judged from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight," *Goodwin v. City of Painesville*, 781 F.3d 314, 321 (6th Cir. 2015) (citation omitted). Although the ultimate determination of reasonableness must be based on the totality of the circumstances, we have found three factors to be helpful in excessive force cases: "the severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the officers or others, and whether he is actively

resisting arrest or attempting to evade arrest by flight." *Id.* (citation omitted). We do not assess these factors from a distance but rather consider that "police officers are often forced to make split-second judgments—in circumstances that are tense, uncertain, and rapidly evolving—about the amount of force that is necessary in a particular situation." *Mullins v. Cyranek*, 805 F.3d 760, 765–66 (6th Cir. 2015).

If the facts show that a constitutional right was violated, we next ask "whether the right was clearly established . . . in light of the specific context of the case." *Scott*, 550 U.S. at 377. A clearly established right is one that is "sufficiently clear that every reasonable official would have understood that what he is doing violates that right." *Reichle v. Howards*, 566 U.S. 658, 664 (2012) (citation modified). "In other words, existing precedent must have placed the statutory or constitutional question confronted by the official beyond debate." *Plumhoff v. Rickard*, 572 U.S. 765, 779 (2014) (citation modified). Usually, this requires a plaintiff to "point to a case showing that reasonable officers would have known their actions were unconstitutional under the specific circumstances they encountered." *Bell v. City of Southfield*, 37 F.4th 362, 367 (6th Cir. 2022). But "in an obvious case," the law can be clearly established "even without a body of relevant case law." *Brosseau v. Haugen*, 543 U.S. 194, 199 (2004).

1.

Frasure first claims that the Officers used excessive force when they pointed their firearms at him and Joe prior to the shooting. The magistrate judge concluded, and Frasure does not appear to dispute, that Warmack pointed his weapon at Frasure and Joe for approximately six seconds each, Jones pointed his weapon at Frasure and Joe for about 10 seconds, and Batts pointed his weapon at Frasure for one second and at Joe "for a moment or two" prior to the shooting. R. 90, PID 3981, 3983, 3985. Frasure challenges both the magistrate judge's finding that the Officers'

pointing their weapons did not violate Frasure and Joe's constitutional rights and that the right was not clearly established.

Because Frasure has not demonstrated a clearly established right relevant to this claim, "we begin and end with the second prong" of the qualified immunity analysis. *Gordon v. Bierenga*, 20 F.4th 1077, 1082 (6th Cir. 2021). Frasure "bears the burden of showing that a right is clearly established," yet there is scant mention in his brief of any cases clearly establishing the alleged violation here. *Wiley v. City of Columbus*, 36 F.4th 661, 669 (6th Cir. 2022).[12] And *Brown v. City of Wyoming*, 2024 WL 5040781 (6th Cir. Dec. 9, 2024) (per curiam)—the only case Frasure raises that could be construed as relevant to this claim—was decided after the events at issue and is therefore "of no use in the clearly established inquiry." *Brosseau*, 543 U.S. at 600 n.4.[13] Regardless, *Brown* is both distinguishable and unhelpful to Frasure.

In *Brown*, officers were dispatched to a suspected breaking and entering based on a call from a neighbor. 2024 WL 5040781, at *1. One of the officers ("Wieber") had previously responded to a trespassing call made by the same neighbor at the same address and had arrested the suspected trespasser. *Id.* On his way to the building, Wieber called the neighbor who confirmed that the man trespassing was the same person Wieber had previously arrested. *Id.* at *2. When Wieber arrived, he and the other officers commanded anyone inside the house to exit with their hands in the air. *Id.* Three men exited. Despite realizing that the person he had previously arrested was not present, Wieber continued shouting commands and eventually arrested

---

[12] Indeed, the only section of Frasure's brief that appears to be dedicated to the "clearly established" prong for all three excessive force claims is a single paragraph generally stating the law.

[13] Frasure also several times cites *Graham v. Connor* when arguing that the Officers acted unreasonably when they pointed their weapons at him and Joe. Even if we construe these citations as part of Frasure's "clearly established argument," *Graham* alone does not provide the level of specificity sufficient to clearly establish a violation. *White v. Pauly*, 580 U.S. 73, 80 (2017) ("[W]e have held that [*Tennessee v. Garner*, 471 U.S. 1 (1985)] and *Graham* do not themselves create clearly established law outside an obvious case.") (citation modified).

the men. *Id.* Although Wieber's weapon was drawn during the entirety of these events, it was pointed at the ground. *Id.* at *6. One of the officers accompanying Wieber pointed his weapon momentarily at the plaintiffs, while the other trained his gun on them for less than three minutes, lowering it only when the plaintiffs had been handcuffed. *Id.* at *6–7.

We found that qualified immunity barred the plaintiffs' claims of excessive force against all the officers, including the officer who pointed his weapon at the plaintiffs for several minutes. *Id.* at *6–9. In reaching this conclusion, we emphasized that the officer only "briefly trained his weapon on plaintiffs to protect himself and his fellow officers, who were responding to a potential felony breaking and entering" and that the caselaw does not make clear that "every reasonable officer in [his] shoes would have understood that what he was doing violate[d] a constitutional right." *Id.* at *8 (citation modified). It therefore follows that the Officers' pointing their weapons at Frasure and Joe for at most ten-seconds during a burglary investigation is not a constitutional violation clearly established by law.

Frasure's claim that Jones used excessive force after the shooting when he pointed his firearm and shouted at Frasure that "you're gonna get shot" fails for the same reason. Further, Frasure does not identify which part of the magistrate judge's analysis he challenges, develop any argument beyond stating in conclusory fashion that Jones used excessive force in violation of Frasure's Fourth Amendment rights, or cite a single case. The Officers are therefore entitled to qualified immunity for both excessive force claims premised on the drawing of their weapons.

2.

Frasure next contends that the magistrate judge erred in granting qualified immunity to Jones and Batts for their use of deadly force. Frasure takes issue with the magistrate judge's reliance on the Officers' "self-serving affidavits" and their experts' reports over the body-camera

footage and interviews, which he contends "do not support the theory Jones and Batts feared for their lives nor that it was objectively reasonable for them to fear for their lives." Appellants' Br. at 23, 25.

Frasure is correct that our analysis is first and foremost guided by the body-camera footage with any gaps construed in his favor. But that does not preclude us from considering the Officers' affidavits and deposition testimony to the extent they are consistent with the video evidence. For example, Batts' testimony that, as he was running up the hill, he peered over his shoulder, sensed the van gaining on him, and saw the front of the van "only a handful of feet away" is consistent with the body-camera footage showing Batts running away from the van in the seconds before the shooting. R. 49-6, PID 1630–31. On the other hand, the video evidence does not conclusively support Batts' assertion that he shot because he felt "the van was going to crush [him] into the wall of 322 Durrell" and that "the van [was] closing in on [him] and the space between the buildings [was] already narrow." *Id.* at 1631. Even so, however, it is clear from the body-camera footage that the van was moving towards Batts in the moments before he fired such that we cannot say that no reasonable officer would have perceived a threat in that moment. Frasure additionally challenges the magistrate judge's reliance on Jones' later testimony that he shot because he was afraid of being sideswiped and, though he had lost track of where Batts was, was certain Batts was going to be struck as incompatible with the video evidence. But Jones' testimony is consistent with his body-camera footage, which captures the car cutting towards him and Batts' running in front of the van the second before Jones fired.

Frasure further argues that *Smith v. Cupp*, 430 F.3d 766 (6th Cir. 2005) clearly established the right not to be seized by deadly force when fleeing arrest. But Frasure has not shown that

Jones and Batts violated a clearly established right. *Lawler ex rel. Lawler v. Hardeman County*, 93 F.4th 919, 925 (6th Cir. 2024).

The law "does not require a case directly on point for a right to be clearly established, [but] existing precedent must have placed the statutory or constitutional question beyond debate." *White*, 580 U.S. at 79 (citation modified). The "clearly established law" should not be defined "at a high level of generality." *Ashcroft v. al-Kidd*, 563 U.S. 731, 742 (2011). "[S]pecificity is especially important in the Fourth Amendment context, where the Court has recognized that it is sometimes difficult for an officer to determine how the relevant legal doctrine, here excessive force, will apply to the factual situation the officer confronts." *Mullenix v. Luna*, 577 U.S. 7, 12 (2015) (per curiam) (citation modified). However, "[t]here need not be a case with the exact same fact pattern or even 'fundamentally similar' or 'materially similar' facts," to find an officer is not entitled to qualified immunity. *Binay v. Bettendorf*, 601 F.3d 640, 652 (6th Cir. 2010) (quoting *Cummings v. City of Akron*, 418 F.3d 676, 687 (6th Cir. 2005)). "[J]ust as a court can generalize too much, it can generalize too little. If it defeats the qualified-immunity analysis to define the right too broadly" then "it defeats the purpose of § 1983 to define the right too narrowly." *Hagans v. Franklin Cnty. Sheriff's Off.*, 695 F.3d 505, 508–09 (6th Cir. 2012).

*Smith v. Cupp*, the one case Frasure cites, is distinguishable. There, an officer arrested a suspect for making harassing phone calls, a misdemeanor. 430 F.3d at 769. The officer read the suspect his Miranda rights, patted him down, cuffed him, and put him in the back of the police car. *Id.* The officer then left the car unattended with the engine running, and the suspect climbed into the driver's seat and began to drive. *Id.* According to the plaintiff's evidence, the officer shot the suspect after the car had gone by the officer and "there was no immediate danger to anyone in the vicinity." *Id.* at 773. In concluding that the officer's use of force was unreasonable, we

emphasized that the suspect "had been cooperative up to this point, and was arrested for the nonviolent offence of making harassing phone calls." *Id.* Importantly, we highlighted evidence that the officer had lied when recounting the scene, as well as evidence that he was running up to the side of the car and "was never in the line of flight." *Id.* at 774. And although we recognized that the events had developed rapidly, we determined that "this [was] not a case where a dangerous situation evolved quickly to a safe one before the police officer had a chance to realize the change" in part because the officer "was not in any danger in the first place." *Id.* at 774–75.

Here, unlike the suspect in *Cupp*, Joe was a suspect in a burglary who had not been patted down or secured. Joe was uncooperative before the shooting; less than five seconds before they fired, Jones and Batts saw Joe disobey Warmack's orders and then drive toward him, causing him to jump out of the way. And in the moments right before the shooting, Batts was directly in front of the car, running away as it accelerated up the grassy hill. Jones' and Batts' conduct is therefore unlike that of the officer in *Cupp*, who tried "to get between the [car] and the exit" when the car was accelerating and "fired as he ran toward the driver side of the car after the car passed him." *Id.* at 774. Additionally, as we have recognized in distinguishing *Cupp*, that case "involved officers confronting a car in a parking lot and shooting the non-violent driver as he attempted to *initiate* flight." *Latits v. Phillips*, 878 F.3d 541, 553 (6th Cir. 2017) (emphasis in original). Batts and Jones shot Joe after he had already initiated flight, sought to evade capture, nearly hit Warmack, and was driving in their direction—"important factual distinction[s] that se[t] this case apart." *Id.*

To be sure, we have previously found that Supreme Court and Sixth Circuit caselaw clearly establishes that an officer may not use deadly force against a fleeing felon who poses no threat to others, but those cases involved materially different circumstances from those present here. *See,*

*e.g.*, *Bouggess v. Mattingly*, 482 F.3d 886, 894–95 (6th Cir. 2007) (applying *Garner* to hold that an officer who employs deadly force against a suspect running directly away from the officer on foot is not entitled to qualified immunity); *Sigley v. City of Parma Heights*, 437 F.3d 527, 537 (6th Cir. 2006) (same where officer "was running behind [the suspect's] car, out of danger, and [the suspect] drove in a manner to avoid others on the scene in an attempt to flee); *Godawa v. Byrd*, 798 F.3d 457, 465–68 (6th Cir. 2015) (applying *Garner* and *Cupp* to hold that "a genuine dispute of material fact exist[ed] regarding the circumstances of [the officer's] impact with [the plaintiff's] vehicle" where officer who used deadly force "was positioned near the rear passenger side [when] he fired his weapon" and the suspect "never attempted to hit [the officer] with his car and did not drive in a manner that endangered [the officer's] life"). Because our analysis must be "reasonably particularized," these key differences render these cases insufficiently analogous. *Latits*, 878 F.3d at 552 (citation modified).

In sum, Frasure has not pointed to a case that meets the requisite level of specificity to place Jones and Batts on notice that their conduct was unlawful. For this reason, the district court did not err when finding Jones and Batts were entitled to qualified immunity.

## B. Municipal Liability

Frasure's remaining claims are for municipal liability against the City. The precise theories of municipal liability that Frasure presses are somewhat unclear, but he appears to allege that the City failed to train or supervise officers, had a custom and policy of failing to train, and ratified past unconstitutional behavior.

A municipality can be held liable for a constitutional violation under § 1983 if the plaintiff demonstrates that the violation occurred "because of a municipal policy or custom." *Franklin v. Franklin County*, 115 F.4th 461, 470 (6th Cir. 2024) (quoting *Burgess v. Fischer*, 735 F.3d 426,

478 (6th Cir. 2013)). To make a showing of an illegal policy or custom, a plaintiff must demonstrate one of the following: (1) the existence of an illegal official policy or legislative enactment; (2) that an official with final decision making authority ratified illegal actions; (3) the existence of a policy of inadequate training or supervision; or (4) the existence of a custom of tolerance or acquiescence of federal rights violations. *See Thomas v. City of Chattanooga,* 398 F.3d 426, 429 (6th Cir. 2005). A municipality may not be sued under § 1983 on a theory of vicarious liability for injury inflicted by its employees or agents. *Monell v. Dep't of Soc. Servs.*, 436 U.S. 658, 694 (1978).

Frasure's arguments regarding his municipal liability claims are fatally undeveloped. *See Thomas v. United States*, 849 F.3d 669, 679 (6th Cir. 2017). The thrust of his argument on appeal consists of statements made by Chief Brady, Jones, Warmack, and Batts copied and pasted from his summary judgment briefing that Frasure states, without analysis, demonstrate the City's failure to train and supervise. In several places, Frasure asserts contradictory facts that undermine key elements of his claims,[14] and he elsewhere fails to allege any facts establishing the required elements, including causation. Absent too are citations to any cases—including *Monell*—or an explanation of how the magistrate judge erred. It is insufficient "for a party to mention a possible argument in the most skeletal way, leaving the court to . . . put flesh on its bones." *McPherson v. Kelsey*, 125 F.3d 989, 995–96 (6th Cir. 1997) (citation omitted). Because Frasure's claims are "adverted to in a perfunctory manner, unaccompanied by some effort at developed argumentation,"

---

[14] For example, Frasure states simultaneously that the City police department had "no procedure or training manual" but also that the department's written policy manual was inadequate. *Compare* Appellants' Br. at 35 *with id.* at 33; R. 58, PID 2050–51. And, in support of his failure-to-supervise claim, he asserts at once that Jones, who was in a supervisory role on the shift, did not adequately communicate with Batts and Warmack, *see* Appellants' Br. at 33, but also that "[t]here was no supervisor on duty," *id.* at 35.

they have been forfeited. *Buetenmiller v. Macomb Cnty. Jail*, 53 F.4th 939, 946 (6th Cir. 2022) (citation modified).

### C. Expert Disqualification

Finally, Frasure appeals the magistrate judge's disqualification of his expert, Dr. Hunter, for failure to comply with Fed. R. Civ. P. 26(a)(2)(B) and under Fed. R. Evid. 702. Frasure argues that the failure to timely provide a signed expert report, Hunter's CV, and an exhaustive list of evidence on which Hunter relied was harmless, and that Hunter's report complies with F.R.E. 702 because it is consistent with the expert report admitted in *Huntzinger v. Coyle*, 2022 WL 95280 (E.D. Ky. Jan. 10, 2022).

In his report, Dr. Hunter summarizes "three seminal court cases that guide law enforcement in their application of use of force,"[15] as well as sections of the City's policies and procedures manual and non-binding national policies and papers on the use of force. R. 58-1, PID 2058–66. The section dedicated to "Officer Analysis" includes screenshots from the Officers' body-camera footage accompanied by Hunter's narration of the events depicted. *Id.* at PID 2066–78. The report ends with Hunter's "findings" detailing "better approaches" the Officers could have taken and opportunities to de-escalate that are apparent "with hindsight." *Id.* at PID 2078–81.

Because we agree with the magistrate judge's determination that "Dr. Hunter's report is not particularly important to the resolution of this matter" and its admission would not have altered the ultimate outcome of Frasure's excessive force and municipal liability claims, we need not reach the question whether the report's exclusion amounts to an abuse of discretion. R. 89, PID 3941. For example, Hunter opines that Batts was "finished running" when he "turned around to engage

---

[15] These cases are *Terry v. Ohio*, 392 U.S. 1 (1968), *Tennessee v. Garner*, 471 U.S. 1 (1985), and *Graham v. Connor*, 490 U.S. 386 (1989).

with the [van]" and that both Batts and Jones were clearly standing on the grass when they discharged their weapons. R. 58-1, PID 2071, 2077. Hunter recognizes, however, that Batts was "running away" from the van as it drove forward. *Id.* at PID 2074. And the video evidence makes clear that what Hunter refers to as "engagement" was Batts turning and shooting as the van moves toward him. Our caselaw recognizes that officers may use deadly force when confronted with a rapidly evolving threat, including where a dangerous situation turns quickly into a safe one before officers have a chance to realize it or react. Hunter's conclusion that the Officers "could have or should have moved out of the way" would not support a finding that it was unreasonable for the Officers not to have simply moved out of the way in what Hunter acknowledges was a rapidly evolving situation. *Id.* at PID 2079–80. And Hunter's statement that "[a]t no time [were] Warmack or Jones in danger of being struck" implicitly concedes that Batts was. *Id.* at PID 2080.

Any error in striking the report outright was thus harmless and does not warrant reversal. *See Int'l Union, United Auto., Aerospace & Agr. Implement Workers of Am. v. Aguirre*, 410 F.3d 297, 304 (6th Cir. 2005) (finding district court's exclusion of expert affidavit harmless where the affidavit "would not [have] alter[ed] our conclusion that defendants cannot be held liable" if admitted).

## IV.    Conclusion

For the foregoing reasons, we AFFIRM.